WAL-MART STORES, INC., A Delaware Corporation
d/b/a Sam's Club *v.* The P.O. MARKET, INC.,
A Texas Corporation; Joseph O'Banion,
Leonard Hoffman, and Michael McNew

00-1223 66 S.W.3d 620

Supreme Court of Arkansas
Opinion delivered February 14, 2002
[Petition for rehearing denied March 21, 2002.]

*Williams & Anderson LLP*, by: *Peter G. Kumpe* and *Stephen B. Niswanger*, for appellant.

*Hardin, Jesson & Terry*, by: *Bradley D. Jesson* and *Rex Terry*; *Dover & Dixon, P.A.*, by: *Thomas S. Stone* and *Michael Johns*; *McKool Smith, P.C.*, by: *Lewis T. LeClair, Robert Goodfriend*, and *Garret W. Chambers*; and *Patton, Haltom, Roberts, McWilliams & Greer*, by: *James C. Wyly*, for appellees.

R OBERT L. BROWN, Justice. This is a trade-secrets case. The appellant is Wal-Mart Stores, Inc., doing business as Sam's Club. The appellee is P.O. Market, Inc., a Texas corporation, as well as three individuals: Joseph O'Banion, Leonard Hoffman, and Michael McNew, all of whom are principals in P.O. Market. Following a ten-day jury trial, P.O. Market was awarded $31.7 million in compensatory damages for misappropriation of a trade secret. The trial court also awarded attorneys' fees of $5 million. Wal-Mart now appeals the jury's verdict and raises four points: (1) a trade secret was not involved; (2) there was no competent evidence of misappropriation; (3) the trial court erred in various evidentiary rulings and in instructing the jury; and (4) the judgment improperly permits double recovery of damages. We reverse the judgment on the first point and dismiss the case.

P.O. Market was a Texas corporation which was incorporated by Joe O'Banion on December 4, 1992. O'Banion's brother-in-law, Dallas attorney Leonard Hoffman, prepared the incorporation documents. P.O. Market was capitalized at $1,500 and never received any additional capital. It never filed income tax returns. P.O. Market's three shareholders (O'Banion, Hoffman, and McNew), however, did conduct regular business meetings. In 1992 and 1993, the corporation was in good standing in Texas and qualified to do business in Arkansas.[1]

Before the creation of P.O. Market, O'Banion and McNew were owners of Southwest Factors, a Little Rock factoring business. Southwest Factors offered credit to subcontractors by purchasing their accounts receivable and then collecting those accounts.

Sam's Club is a division of Wal-Mart Stores and is headquartered in Bentonville. It is a wholesale warehouse club. Members of Sam's Club are able to buy goods in bulk at wholesale prices. The Export Division of Sam's Club handles bulk transactions for large-scale purchasers. These bulk purchasers typically buy in large quantities by the truckload or in shipping containers. Most of these export purchasers are domestic companies, despite the name of the department. These large-scale bulk sales are effected via direct shipment from a manufacturer, vendor, or a Sam's distribution center to the customer and do not involve any individual Sam's Club store.

Prior to November 1993, there was not a system in place at Sam's Club for purchasers of large quantities of goods to finance their purchases.[2] Specifically, Sam's Club customers could not submit a purchase order from their company that was payable at a later time because Sam's Club operated on a "cash and carry" basis, with the sole exception of Discover credit card purchases.

In August of 1992, O'Banion first learned of this cash-and-carry feature of Sam's Club. At that time, he was approached by Dan DeLaughter, who was a representative of a corporation called The Service Department in Little Rock. The Service Department

---

[1] Although the corporation was not formed until December 4, 1992, after the occurrence of some of the events that gave rise to this litigation, it will be referred to as being in existence before that time for convenience.

[2] P.O. Market alleged in its complaint, and Sam's Club admitted in its answer, that Wal-Mart founder Sam Walton had a "philosophical aversion" to consumer credit. Hence, Wal-Mart and its divisions were slow to adopt credit programs such as the one at issue in this case.

bought goods wholesale from Sam's Club and then resold them to its customers at a markup. DeLaughter approached O'Banion at Southwest Factors about financing a bulk purchase of computers for The Service Department, to be resold to the University of Arkansas at Little Rock. Southwest Factors declined to do the financing due to the credit risk. Through these negotiations, O'Banion met the manager of the Sam's Club store in Little Rock, Mike Hampson. According to O'Banion's trial testimony, Hampson told him that bulk credit purchases were a huge untapped market for Sam's Club.

Following that conversation, O'Banion contacted Hampson with a proposal that Sam's Club buy his idea for a way to execute bulk credit transactions. Subsequently, Hampson put O'Banion in touch with a Sam's Club executive named Sharon Austin. Austin was a member of the Export Division of Sam's Club, and her title was Export Business Developer. For part of the time relevant to this litigation, she reported directly to Colin Washburn, who was then Sam's Club General Merchandise Manager. Washburn, in turn, reported to the CEO of Sam's Club. At other times, Austin reported to another member of the Export Division, manager Scott Burford. In September 1992, O'Banion and Austin arranged to meet in Bentonville to discuss the P.O. Market proposal. O'Banion testified at trial that Austin agreed during this telephone conversation to keep O'Banion's proposal confidential.

On October 7, 1992, O'Banion sent Austin a letter confirming the meeting and requesting that all information disclosed thus far be kept confidential. O'Banion's proposal to Sharon Austin was outlined in his letter. The salient points were these: After a purchaser submitted a purchase order to Sam's Club, P.O. Market would buy the named goods from Sam's Club. P.O. Market would receive the most favorable pricing from Sam's Club, which the letter described as "favored nation" pricing. It would be a same-day settlement. P.O. Market would take title to the goods, would mark up the price of the goods, and sell them on a credit basis to the purchaser. Between the "favored" pricing of the goods and the mark-up to the end customer, O'Banion estimated that P.O. Market would realize a profit of between 8% and 12% of gross sales. O'Banion further proposed that P.O. Market be granted a nonexclusive license to use Sam's Club logos and trademarks in order to boost bulk purchaser confidence in its operation.[3] He proposed that P.O. Market have a

---

[3] This license was considered by O'Banion to be critical in obtaining financing for P.O. Market to be able to make the kinds of bulk purchases contemplated.

regional sales force, in addition to advertising, to market the bulk credit purchase service to Fortune 500 companies and other large purchasers. These purchasers would be preapproved by P.O. Market's financing institution, which O'Banion contemplated would manage the credit risk as well as the same-day settlement of Sam's sales transactions. The lender would also track the purchasers' orders and accounts.

Under O'Banion's proposal, Sam's Club would guarantee the quality of their products just as in any regular sales transaction made directly between a customer and Sam's Club. He also proposed setting up direct computer communications to allow a purchaser to place an order with P.O. Market, and that same day for the order to be transmitted to Sam's Club for the goods to be pulled and "dock ready" for delivery the next business day. The letter proposed a five-year exclusive arrangement between P.O. Market and Sam's Club. Though O'Banion's proposal later changed in certain respects, for ease of convenience we will refer to it as the O'Banion concept.

O'Banion testified that his concept allowed the bulk purchaser to get the benefit of a credit transaction for a wide variety of products. A business's entire procurement needs could be satisfied with one purchase order. This could be accomplished under his plan without exposing Sam's Club to any credit risk, because P.O. Market took title to the goods and thereby assumed the risk of non-payment. Further, Sam's Club would receive same-day settlement of sales transactions, which O'Banion understood to be critical to Sam's Club. According to O'Banion, Sam's Club also got the benefit, if P.O. Market expanded Sam's Club's market share, of gaining deeper discounts from vendors as its own purchases got bigger. P.O. Market got the benefit of the price mark up, although it bore the credit risk. O'Banion testified at trial that he was not very concerned about credit risk because he contemplated doing business only with large corporate and government purchasers. Moreover, potential purchasers would have to qualify with P.O. Market's financial institution as a low credit risk to participate in the program. The October 7, 1992 letter contained a paragraph requesting Austin to keep the proposal confidential.

In early October 1992, O'Banion, Leonard Hoffman, and Michael Hill, who was also interested in the O'Banion concept, met with Sharon Austin and another Export Division employee named Ralph Bane at the Sam's Club headquarters in Bentonville. According to O'Banion's trial testimony, Austin and Bane told him that Sam's Club was not discussing a similar credit arrangement

with any other potential partner. O'Banion further testified that Austin told him that she would communicate his proposal to her Sam's Club superiors and to the Wal-Mart legal department. If they were not interested, she said she would contact him within 24 hours. In her trial testimony, Austin stated that she only remembered giving the proposal to her boss, Export Division manager Scott Burford.

At the October meeting, Hoffman stressed to all parties the need to maintain confidentiality. He produced a confidentiality agreement that he had prepared for the meeting. According to O'Banion's trial testimony, Austin told him to put his agreement away because it would not be needed. She preferred to give her word that the matters discussed at the meeting would be kept confidential.

After Austin and O'Banion's initial meeting, a second meeting was held on November 9. At this meeting, O'Banion, Hoffman, and Hill met with Sharon Austin in her office in Bentonville. O'Banion took a draft license and sales agreement with him, but he did not show her the document because there were some changes that Hoffman wanted to make to the draft. After the second meeting, O'Banion and Hoffman mailed Austin the revised license and sales agreement. O'Banion testified at trial that based on the mood at the second meeting, he expected to close the deal and get the revised license and sales agreement signed in the near future. Austin, however, requested that O'Banion send another letter to her describing the P.O. Market proposal in simpler language than was used in the license and sales agreement. In a letter dated November 18, 1992, O'Banion did so.

There were several changes in the O'Banion concept in the November 18 letter. First, a distinction was made between orders of 5,000 items or more in that these bulk purchases of 5,000 items or more would be shipped directly from the vendor to the purchaser without any Sam's Club store involvement. Also, the term of the prospective agreement was shortened to three years. The November 18 letter further proposed a five-state region in which to begin the bulk credit purchase program rather than nationwide. P.O. Market would thus begin by servicing only a portion of the 268 Sam's Club stores.

After the November 18, 1992 letter, Austin and O'Banion met for a third time in early December 1992. P.O. Market was represented by O'Banion, Hoffman, and Hill. Austin and Bane were

accompanied by Scott Burford and a buyer's assistant named Debra Connell. At this meeting, Austin told O'Banion that the license and sales agreement was currently being reviewed by the legal department. She stated that the legal department had problems with two aspects of the agreement, namely, the licensure and the exclusivity. The legal department did not want to grant P.O. Market a license to use Sam's Club logos and trademarks. In addition, she said that the legal department believed that the exclusivity clause might represent an antitrust problem. It also believed that it was impossible for Wal-Mart to agree to the exclusivity clause because Sam's Club already had credit arrangements utilizing the Discover card.

Regardless of these problems, O'Banion testified that he still believed that the agreement would be signed "any day." He emphasized to Austin that he needed a signed agreement to obtain the necessary financing to enable P.O. Market to purchase the bulk goods from Sam's Club and begin operations. In a follow-up letter of December 15, 1992, he enclosed a new version of the agreement, which had now become only a sales agreement with the licensing feature eliminated. This third version of the agreement, like the two before it, contained a confidentiality agreement.

Austin informed O'Banion that she would give the proposed sales agreement to her superiors and to the legal department. When O'Banion called her to find out about its status, he testified that she told him, "We've passed it up to the people who approve these. They don't have a problem. It should be signed at some point. Any day." The agreement was not signed, and Austin denied at trial ever having passed the documents along to the legal department.

On January 7, 1993, there was a fourth meeting between O'Banion and Hoffman and Austin, Burford, and Connell. At this meeting, according to O'Banion, the same assurances were given that the sales agreement would be signed any day.

Also raised as a topic at the January 7 meeting was the prospect of P.O. Market's arranging bulk credit transactions for customers in Mexico. Sam's Club customers had been buying goods in bulk in the United States and then marking the goods up for retail sale across the border in Mexico. Sam's Club stores along the border had been accepting letters of credit from these bulk purchasers. This letter-of-credit arrangement, however, was not a Sam's Club corporate program but rather was handled by each individual store manager. Sam's Club's border stores were losing money on the letter-of-credit arrangement, according to Austin. She proposed

that P.O. Market set up a system of financing for these customers, which were higher-risk than those originally contemplated by O'Banion's proposal.

O'Banion testified that he was willing to do a credit arrangement for purchases in Mexico if that would result in his getting the sales agreement signed. Hoffman drafted a proposal for the Sam's Club border stores and the letters of credit in January 1993. Meanwhile, O'Banion was calling Austin regularly to check on the status of the sales agreement.

Sometime in January 1993, Austin stopped returning O'Banion's telephone calls. To get Sam's Club back to the table, Hoffman drafted a letter to Austin in which he enclosed four additional drafts of the sales agreement and repeated that financing for P.O. Market's bulk purchases from Sam's Club would not be forthcoming until a signed sales agreement was in place.

During November and December 1992 and January 1993, O'Banion discussed potential financing for P.O. Market's purchase of bulk goods from Sam's Club with approximately eight lenders. He was rejected by several of the lenders, each of whom he presented with a copy of his concept, accompanied by a confidentiality agreement. With the help of a businessman in Atlanta, Georgia, Bill McBrine, he finally settled on NationsBank, now Bank of America, to finance P.O. Market's operation. NationsBank Executive Vice President Steve Sims was, according to O'Banion and McBrine, interested in meeting with O'Banion, Austin, and Sam's Club executives with the authority to sign the sales agreement. In a letter dated March 11, 1993, Hoffman emphasized to Austin that Sam's Club's financial officers would need to attend this meeting, which was scheduled for March 22, 1993.

The meeting, however, never took place, as Austin did not respond and was still not returning O'Banion's telephone calls at this time. Because Austin never confirmed whether Sam's Club financial officers would attend the March 22 meeting, O'Banion canceled it. Austin, however, testified at trial that she wanted the meeting to take place because she was still hopeful that P.O. Market would take over the credit arrangements for the Sam's Club stores along the Mexican border.

In March of 1993, O'Banion gave up hope of Sam's Club agreeing to his proposal. He returned to his work at Southwest Factors, where he continued to engage in factoring accounts

receivable for various clients in the construction industry. He had no contact with any representative of Sam's Club between January 1993 and November 1993.

In November 1993, McBrine called O'Banion and alerted him to an article he had read in the *Wall Street Journal* dated November 2, 1993, entitled "Wal-Mart Sets Sights on Big Customers in Bid to Improve Warehouse-Club Unit." The article described a new program established by Sam's Club which allowed bulk purchasers to buy goods on credit. O'Banion later saw a similar article in the *Dallas Morning News*, also dated November 2, 1993, and entitled "Sam's Club Program to Compete Against Corporate Suppliers."

O'Banion testified that he then tried to contact Sharon Austin at her office in Bentonville but could not reach her there. He learned that she no longer worked for Sam's Club but was instead doing consulting work. He did finally manage to contact her by telephone, and he talked to her in November 1993 and April 1994. Unbeknownst to Austin, he taped these telephone conversations. During these telephone conversations, Austin told him that there was no doubt that the idea of bulk credit purchasing was O'Banion's idea, that he had "made it easy for them" to implement the new program, that O'Banion had educated Wal-Mart, and that Wal-Mart had "stepped on" O'Banion. Austin, in these telephone conversations, also told O'Banion that she could not be sure whether or not his proposals had ever made it into the hands of top-level Sam's Club executives. She did say, however, that she briefly "ran it by" Al Johnson, who was then CEO of Sam's Club. At trial, however, she testified that she was not sure whether or not this encounter had taken place because Johnson had vacated the position of CEO prior to her first contact with O'Banion. She also told him that she had given the proposal to the legal department. O'Banion admitted that the reason why he secretly taped some of these telephone conversations was because he had decided to file suit against Wal-Mart.

During the period in November and December 1992, when O'Banion had been meeting with Sam's Club executives about his concept, Wal-Mart executives had been meeting with representatives of General Electric Capital Corporation (GECC) about developing a credit system for bulk purchases. GECC had been interested in establishing such an arrangement with Wal-Mart for a number of years. In late 1992 and early 1993, GECC finally succeeded in getting Wal-Mart to agree to such a program for a five-year exclusive term.

Under the GECC program, which was named Sam's Club Direct program, Sam's Club sold bulk goods to large purchasers in credit transactions and then sold the accounts receivable to GECC for full price.[4] GECC never took title to the goods; rather, title to the goods passed directly from Sam's Club to the purchaser. The transaction was facilitated by either the new Sam's Club credit card created by GECC or by a credit account number for larger purchases. GECC, having bought the accounts receivable, would handle the purchase-order tracking and the billing of the credit card accounts. GECC made a profit by charging a $100 fee to open a credit account for Sam's purchases. The GECC program was directed toward purchases from $300 or $400 and higher. Delivery would only be available for very large purchases. Sam's Club would use its own sales force to market its new service.

In February 1993, Wal–Mart and GECC exchanged letters of confidentiality and exclusivity. In March 1993, they signed a Master Agreement in which they agreed to implement GECC's proposal regarding bulk credit transactions. The program became operational in November of 1993.

P.O. Market filed its first complaint against Wal–Mart for misappropriation of a trade secret in 1994 or 1995 in Pulaski County Circuit Court. It later nonsuited that action. On April 9, 1999, P.O. Market filed the complaint giving rise to this appeal in Miller County Circuit Court. At the time, O'Banion resided in Texarkana. The complaint included six causes of action: breach of implied contract, breach of a confidentiality agreement, breach of confidential relations, misappropriation of a trade secret, unjust enrichment, and negligence. What lay at the core of P.O. Market's complaint was that Wal–Mart had stolen the O'Banion concept and implemented it with GECC as the Sam's Club Direct program. Sam's Club answered and filed a motion for summary judgment on grounds that no trade secret was involved. The motion was denied by the trial judge.

At the jury trial in March 2000, P.O. Market presented the testimony of Joe O'Banion, Leonard Hoffman, and Sharon Austin, among others. As part of his testimony, O'Banion testified that P.O. Market had lost profits of between $8,651,897 and $30,057,771, due to Sam's Club's improper conduct. These figures were based on

---

[4] GECC later began charging a 1.37% charge to Sam's Club for each transaction that it financed.

Sam's Club manager Mike Hampson's initial estimates of an additional $12 million in sales per year for each Sam's Club store that implemented the bulk credit purchase program. O'Banion figured his damages based on two scenarios: first, a scenario in which P.O. Market serviced only a five-state start-up market (the $8 million figure), and second, a scenario in which P.O. Market serviced all 268 Sam's Club stores then in existence (the $30 million figure).

Bill McBrine, who in 1992 was dealing in brokering short-term loans using accounts receivable as collateral for Crown USA, also testified for P.O. Market. He testified that he thought O'Banion's idea was exciting, novel, a unique product, and worth a lot of money. He put O'Banion in touch with NationsBank as a potential financing partner. He also testified that the services proposed by O'Banion were known in the financing industry, but had not been applied to Sam's Club before. Finally, he stated that he proposed that Crown USA get involved in some of the financing of P.O. Market's operation, but that Crown was not interested, because it was in the process of winding down its business at that time.

P.O. Market offered the testimony of Allyn Needham, an economist, as an expert witness. Needham prepared a chart of similarities and differences between the O'Banion concept and the Sam's Club Direct Program. He stated that the two programs had a similar target market (schools, hospitals, governments, Fortune 1000 companies), similar benefits for customers, and similar benefits to Sam's Club. The two programs also had differences, including credit risk exposure to Sam's Club, the sales force to be utilized, and the actual method by which title to the goods was transferred. He testified that despite these differences, which he characterized as "semantic," the moving force behind the two programs was the same. He stated that in his opinion, the two programs were substantially similar.

P.O. Market's final witness was a second expert, Robert Sherwin, an expert in financial economic management. Sherwin testified to the damages suffered by P.O. Market. One calculation of damages was a royalty calculation — how much P.O. Market would have been entitled to for the bulk credit purchase idea alone. It was based on 1.5% of the Sam's Club Direct Program sales for the five years it had been in existence at the time of trial. This royalty calculation resulted in a figure of $6,736,761. Sherwin also testified that P.O. Market, in addition to this royalty figure, stood to make between $21 million and $72 million in profit due to its profit margin for actually carrying out the transactions.

At the end of P.O. Market's case-in-chief, Wal-Mart moved for a directed verdict based on two arguments. Wal-Mart first argued that P.O. Market had offered no evidence that the O'Banion concept was a trade secret. Secondly, Wal-Mart contended that even if it was a trade secret, there was no evidence to show that the secret had been misappropriated. The trial court denied this motion.

Wal-Mart offered the testimony of fourteen witnesses in its case, as well as several portions of depositions that were read into the record. Its defense was that Wal-Mart had been talking to GECC since 1989 about bulk credit purchases and that GECC had implemented comparable programs with other companies. According to Wal-Mart, what O'Banion proposed to Sharon Austin was simply a larger version of what Dan DeLaughter had proposed to O'Banion in August 1992. Moreover, O'Banion's concept was constantly evolving and changing during October, November, and December 1992, and the financing for P.O. Market's purchase of the goods was never effected. Finally, Wal-Mart presented witnesses to the effect that the O'Banion concept and the GECC plan, which resulted in the Sam's Club Direct Program, were markedly different. Hence, it argued that no trade secret was involved, and there was no misappropriation.

Wal-Mart renewed its motion for directed verdict at the close of all the evidence, and the jury was instructed. The jury returned a special verdict and answered two interrogatories. It first found that Wal-Mart had misappropriated a trade secret and then awarded damages of $6,736,761 for P.O. Market's lost profits and $25 million, which represented Wal-Mart's unjust enrichment. Several weeks after the verdict was rendered, the trial court also awarded attorneys' fees of $5 million and costs of $1,125 to P.O. Market. Wal-Mart now appeals this judgment.

## I. Standard of Review

Our analysis must begin with our standard of review. There are two standards involved in our analysis of this case. With respect to a question of a statutory interpretation, we review the matter *de novo* on appeal, as it is for this court to decide what a statute means. *Fewell v. Pickens*, 346 Ark. 246, 57 S.W.3d 144 (2001); *Hodges v. Huckabee*, 338 Ark. 454, 995 S.W.2d 341 (1999). Our review of a denial of a directed-verdict motion is different. A directed-verdict motion is a challenge to the sufficiency of the evidence, and when reviewing a denial of a motion for a directed

verdict, this court determines whether the jury's verdict is supported by substantial evidence. *See, e.g., Pettus v. McDonald II,* 343 Ark. 507, 36 S.W.3d 745 (2001); *Farm Bureau Mut. Ins. Co. v. Foote,* 341 Ark. 105, 14 S.W.3d 512 (2000); *State Auto Property Cas. Ins. Co. v. Swaim,* 338 Ark. 49, 991 S.W.2d 555 (1999). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *See State Auto Property Cas. Ins. Co. v. Swaim, supra; City of Little Rock v. Cameron,* 320 Ark. 444, 897 S.W.2d 562 (1995); *St. Paul Fire & Marine Ins. Co. v. Brady,* 319 Ark. 301, 891 S.W.2d 351 (1995).

When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered, and we give that evidence the highest probative value. *See State Auto Property Cas. Ins. Co. v. Swaim, supra; Arthur v. Zearley,* 337 Ark. 125, 992 S.W.2d 67 (1999); *Union Pac. R.R. Co. v. Sharp,* 330 Ark. 174, 952 S.W.2d 658 (1997). A motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *ConAgra, Inc. v. Strother,* 340 Ark. 672, 13 S.W.3d 150 (2000); *Wal-Mart Stores, Inc. v. Kelton,* 305 Ark. 173, 806 S.W.2d 373 (1991). A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Wal-Mart Stores, Inc., v. Kelton, supra; Stalter v. Coca-Cola Bottling Co.,* 282 Ark. 443, 669 S.W.2d 460 (1984). Under those circumstances, a jury question is presented, and a directed verdict is inappropriate. *Wal-Mart Stores, Inc., v. Kelton, supra; Stalter v. Coca-Cola Bottling Co., supra.* It is not this Court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *Wal-Mart Stores, Inc., v. Kelton, supra; City of Caddo Valley v. George,* 340 Ark. 203, 9 S.W.3d 481 (2000).

## II. Trade Secret

Wal-Mart first urges that the O'Banion concept is not a trade secret and that the trial court erred in declining to direct a verdict in its favor on this point. Initially, Wal-Mart claims that the information included in the O'Banion concept meets neither the statutory definition of a trade secret (Ark. Code Ann. § 4-75-601(4) (Repl. 2001)), nor the six criteria set out in *Saforo & Assocs., Inc. v. Porocel*

*Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999). Wal-Mart disputes in its challenges whether the O'Banion concept was ever concretely defined and further claims that the concept was generally known and readily ascertainable.

At oral argument, Wal-Mart also claimed that placing competing economic ideas under trade-secret protection would have a chilling effect on innovations in the market place. Wal-Mart's point appeared to be that, if P.O. Market is correct, anyone proposing a plan to a company to solve a business problem could then claim a trade secret and prevent that company from using other problem-solving ideas submitted by other persons or entities which embraced some of the same components.

The Arkansas Trade Secrets Act, Ark. Code Ann. § 4-75-601 to -607 (Repl. 2001) (ATSA), defines "trade secret" as follows:

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
>> A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>>
>> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4) (Repl. 2001). In addition to this definition, the issue of whether information constitutes a trade secret under the ATSA is governed by six factors:

> (1) the extent to which the information is known outside the business;
>
> (2) the extent to which the information is known by employees and others involved in the business;
>
> (3) the extent of measures taken by appellee to guard the secrecy of the information;
>
> (4) the value of the information to appellee and to its competitors;

(5) the amount of effort or money expended by appellee in developing the information; and,

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Saforo & Assocs., Inc. v. Porocel Corp., supra* (adopting the six factors from the *Restatement of Torts* § 757, cmt. b); *see also ConAgra, Inc. v. Tyson Foods, Inc.,* 342 Ark. 672, 30 S.W.3d 725 (2000) (applying the *Saforo* factors). Information must meet both the ATSA definition and all of the six *Saforo* factors in order to qualify as a trade secret. *ConAgra, Inc. v. Tyson Foods, Inc., supra.*

a. Information

We first consider whether the O'Banion concept is "information, including a formula, pattern, compilation, program, device, method, technique, or process," and, thus, a trade secret under the ATSA. Ark. Code Ann. § 4-75-601(4) (Repl. 2001). As already stated, to the extent that this issue involves a matter of statutory construction, we will review the issue *de novo,* as it is for this court to decide what a statute means. *Fewell v. Pickens, supra; Hodges v. Huckabee, supra.* Other jurisdictions agree that this "information" facet of the trade secret definition is a legal question. *See, e.g., Weins v. Sporleder,* 569 N.W. 2d 16 (S.D. 1997); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F. Supp. 1405 (N.D. Iowa 1996).

██ ██ The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Raley v. Wagner,* 346 Ark. 234, 57 S.W.3d 683 (2001); *Dunklin v. Ramsay,* 328 Ark. 263, 944 S.W.2d 76 (1997). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Stephens v. Arkansas Sch. for the Blind,* 341 Ark. 939, 20 S.W.3d 397 (2000); *Burcham v. City of Van Buren,* 330 Ark. 451, 954 S.W.2d 266 (1997).

We have, either directly or by inference, passed on whether certain information qualified as "information, including a formula, pattern, compilation, program, device, method, technique, or process," under § 4-75-601(4), in three cases during the past decade. *See Saforo & Assocs., Inc. v. Porocel Corp., supra; Cardinal Freight Carriers v. J.B. Hunt Transp. Service,* 336 Ark. 143, 987 S.W.2d 642 (1999); *Allen v. Johar, Inc.,* 308 Ark. 45, 823 S.W.2d 824 (1992). The case of *Allen v. Johar, supra,* dealt with whether a customer list was a

trade secret. We held that it was, because it took almost twenty years to compile the list, and the list included personal details about the customers such as hobbies and individual preferences. We concluded that the customer list at issue was clearly a "compilation" under the ATSA's definition. In *Cardinal Freight Carriers v. J.B. Hunt Transp. Serv.*, *supra*, there were five pieces of economic data at issue: (1) profits made from particular customers; (2) general profit margins and pricing models; (3) customers' long-term buying habits; (4) general business operating tools such as software; and (5) future plans including marketing strategies. This was "information" as defined by the ATSA and specifically fell into the category of methods, processes, or compilations. Finally, in *Saforo & Assocs. Inc. v. Porocel Corp.*, *supra*, the equipment at issue was a way of partially processing a raw material which was an alumina residue called Bayer Scale through a wash water system. Though the wash water system was a combination of known components, it was unique and qualified as a "process."

Those three cases stand in stark contrast to a case from South Dakota in which the South Dakota Supreme Court held that the plaintiffs could not precisely identify exactly what information they were trying to protect as a trade secret. *See Weins v. Sporleder, supra.* In *Weins*, the issue was whether a livestock feed supplement had been misappropriated. The various competing feed supplements involved the mixing of similar ingredients such as flour, cane molasses, proteins, vitamins, iodine, and the like. The South Dakota Supreme Court, in wrestling with the issue of whether "information" under the trade secret statute was involved, observed:

> Throughout the proceedings, however, there was never a clear assertion as to what exactly was claimed to be the trade secret. Weins' complaint initially refers to the "feed product, and its use and application" as the trade secret. Later in the complaint, Weins states that the "selling and developing of the feed product" is the trade secret. In Weins' amended complaint, there is reference to an "idea," an "invention," a "tub feed product containing a combination of ingredients to be fed free choice," and "selling and developing the feed product" as the trade secret. The second amended complaint refers to the trade secret as a "feeding system." During the trial, Meyer testified the trade secret was the formula alone, while Weins testified the trade secret was not the formula, but the idea of combining ingredients into a tub. In addition, Weins' briefs submitted to this Court fail to assert what exactly constitutes the trade secret.

*Weins,* 569 N.W.2d at 18.

Other jurisdictions have wrestled with the issue of whether the information sought to be protected was sufficiently specific so as to qualify as trade-secret information. In *Coenco, Inc. v. Coenco Sales, Inc.,* 940 F.2d 1176 (8th Cir. 1991), the Eighth Circuit Court of Appeals affirmed a judgment notwithstanding the verdict where the issue was whether a new version of a machine to control the environment in chicken houses violated Coenco, Inc.'s trade secret. Some of the same producers and suppliers were used to operate the competing machines. The Eighth Circuit noted that it was confused as to what specific trade secret was at issue. Similarly, in *Electro-Craft Corp. v. Controlled Motion, Inc., supra,* the Minnesota Supreme Court held that the dimensions of a design of a brushless electric motor were unclear and lacked specificity and, thus, were unsuitable for trade-secret protection.

■ We must confess to some of the same concerns in the case at hand. What precisely comprised the O'Banion concept appears to have been subject to change and in flux throughout discussions with Sam's Club representatives. For example, the licensure feature to use Sam's Club logos and trademarks was discarded after the initial meeting in October 1992, as was the exclusivity provision, and the term of the agreement changed. Over time, the geographic market to be served was also reduced down to five states and at one point appeared to focus on the Sam's Club stores bordering Mexico. Even though we have concerns about the definiteness of the O'Banion concept and whether it is a protectable "method" for bulk credit sales under § 4-75-601(4), we do not decide this case on that basis.

b. Generally known and readily ascertainable

■ We next focus on whether there was substantial evidence that the O'Banion concept derived economic benefit from not being generally known to, and readily ascertainable by, other persons by proper means under § 4-75-601(4)(A). Our standard of review on this factual issue is whether substantial evidence exists to support the verdict. We conclude that the evidence supporting the jury's verdict on this point was insufficient.

There appears to be a dearth of authority on whether an economic plan or idea for structuring a business qualifies as a trade secret. P.O. Market, using our case of *Saforo & Assocs., Inc. v. Porocel Corp., supra,* contends that the O'Banion concept took known

economic principles and molded them into a unique combination that is entitled to trade-secret protection. As already mentioned in part, in *Saforo*, this court upheld a finding of misappropriation of a trade secret where one company used another company's specialized process for constructing a piece of equipment to wash alumina residue. Although each step of the washing process was known in the industry, we held that the unique combination of the known elements into a particularized piece of equipment created a trade secret. In so holding, we were in agreement with other jurisdictions that have considered whether a unique combination of known components constitutes a trade secret. *See, e.g., Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir. 1990); *Weston v. Buckley*, 677 N.E.2d 1089 (Ind. App. 1997); *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890 (Minn. 1983); *Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 (Fla. App. 1983).

The testimony of Joseph O'Banion on cross examination illustrates the fact that he essentially assembled known economic principles in fashioning his concept, which, he contended, was unique:

> COUNSEL: Now, Mr. O'Banion, each of these items listed as part of your proposal, each of these are arrangements or activities that were customarily done in business prior to November 18, 1992, weren't they, sir?
>
> O'BANION: Yes, sir. I would agree with that.
>
> COUNSEL: You'd agree with that. And these activities were well known. I mean, there was nothing secret about these activities, were they?
>
> O'BANION: Uh, individually, there was nothing secret about them. But we, we, you and I have talked about that a lot. So.
>
> COUNSEL: And so, it's your contention that when you combined these activities, that that turned it into something secret?
>
> O'BANION: It turned it into, it was a problem solving situation, Mr. Kumpe, that I had to resolve problems for each and every level of this chart back here or it was not gonna work.
>
> COUNSEL: And each of these various points are part of the solution?
>
> O'BANION: That is correct.

COUNSEL: And each of these activities were known in the businesses world prior to 1992?

O'BANION: Outside of this program, I would agree with that.

COUNSEL: Well, when you combined them together that did not all of a sudden shroud them in secrecy did they, sir?

O'BANION: I don't know of anybody so far that did a, a, to my knowledge, of doing a transfer of risk with minimum cost. I wasn't aware of that situation. Apparently, Wal-Mart wasn't either, because they would have already been doing it, frankly.

The question then that confronts this court is whether the O'Banion concept is indeed unique information or whether it is, at its core, a variation of other economic models already in the public domain and readily ascertainable. *See Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691 (Minn. 1982). Again, we turn to other jurisdictions.

In *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063 (7th Cir. 1992), a methodology for triggering notice to customers to bring cars in for repairs was at issue. The Seventh Circuit Court of Appeals reversed a preliminary injunction by the federal district court and noted that that court had granted trade-secret protection to the "mere idea of using more than one trigger" for car repairs. 982 F.2d at 1073. The Seventh Circuit underscored that this information of "multiple triggers" was generally available in the industry and the fact that Computer Care was first to use it did not, in and of itself, transform otherwise general knowledge into a trade secret. The Seventh Circuit further concluded that the methodology could readily be duplicated.

In *TGC Corp. v. HTM Sports, B.V.*, 896 F. Supp. 751 (E.D. Tenn. 1995), the federal district court entered a judgment notwithstanding a jury verdict and found that the idea of a seamless palm in a sports glove could not qualify as a trade secret, because this idea was public knowledge. As was the case in *Computer Care v. Service Systems Enterprises, Inc.*, *supra*, the district court focused on the point that simply being first to employ an idea did not, by itself, transform general knowledge into a trade secret. As P.O. Market contends in the instant case, TGC Corp. argued that the combination of known factors that went into making the sports glove entitled it to protection "like the recipe for baking a cake." 896 F. Supp. at 760. The district court disagreed that the combination

qualified as a trade secret because its components were already generally known.

And, again, in *Weins v. Sporleder, supra,* the South Dakota Supreme Court concluded that the combination of ingredients that resulted in the feed supplement could not be considered a trade secret because all of the ingredients were public knowledge and being the first to combine them was not enough to warrant protection. In short, the feed supplement in question was easily duplicable. Other courts have reached similar conclusions. *See, e.g., Jostens, Inc. v. National Computer Systems, Inc., supra* (computer software for designing class rings not a trade secret when the system was no different in concept from other systems in public domain and the combination of known data was not so particularized to achieve trade-secret status); *Microbiological Research Corp. v. Muna,* 625 P.2d 690, 699 (Utah 1981) (medical diagnostic kits were not unique combination where defendant had "utilized basic chemistry for a basic process consisting of a series of well known, published steps").

 It is apparent to this court that any person reasonably well versed in the economics of wholesaling and credit purchasing could have put together the O'Banion concept. Indeed, the O'Banion concept was essentially wholesaling in the sense that it contemplated buying goods in bulk at a favorable price and selling them at a markup to preordained customers. Even though we look to the combination of the components and not to their individual qualities, the O'Banion concept was hardly unique. We are hard pressed to conclude that P.O. Market can claim what is essentially a wholesaling model to resolve a problem as its own proprietary information. In short, there was nothing about this business plan that was not generally known in the industry or readily ascertainable. For this reason, we distinguish our decision in *Saforo & Assocs., Inc. v. Porocel Corp., supra,* where what was involved was a highly specialized process for washing alumina residue and where this court concluded that the equipment built to do that was unique.

Joseph O'Banion himself testified that the genesis for his concept was a plan proposed to him by Dan DeLaughter of The Service Department in August 1992 to provide computers to the University of Arkansas at Little Rock. O'Banion was approached to provide financing to The Service Department, which would take title to the bulk sale of computers from Sam's Club and then sell the computers to the university at a markup. This was the essence of the O'Banion concept which was submitted to Sharon Austin on a much greater scale. It, too, is evidence of the fact that a first cousin

of the O'Banion concept was already known and being used in business circles.

██ We give little credence to the testimony of O'Banion and Leonard Hoffman regarding the uniqueness of their proposal. Both men were interested parties, who alleged in their complaint that the O'Banion concept was "a novel business concept not previously tried or considered by Sam's Club or Wal-Mart," and, therefore, was a trade secret. The fact that they testified similarly at trial was simply self-serving and a restatement of their theory of the case. This court has reversed jury verdicts for lack of substantial evidence even when the plaintiffs testified at trial on their own behalf. *See, e.g., State Auto Property & Cas. Ins. Co. v. Swaim, supra; St. Joseph's Regional Health Center v. Munos*, 326 Ark. 605, 934 S.W.2d 192 (1996); *Thompson Newspaper Publishing, Inc. v. Coody*, 320 Ark. 455, 896 S.W.2d 897 (1995). Even Bill McBrine, who testified that the concept was "novel" was directly involved in promoting the plan by attempting to arrange financing at NationsBank. McBrine also admitted that the basics of the O'Banion concept were known in the industry but had not been applied to Sam's Club. Hence, we conclude that the testimony of these three men does not rise to the level of evidence of such sufficient force and character to compel a conclusion on this point with reasonable certainty. *See State Auto Property Cas. Co. v. Swaim, supra*. Nor do we agree that the mere statements by them that a unique or novel idea was involved transforms the matter into a trade secret and raises a reasonable inference for protection purposes.

██ We, again, voice our concern over whether the O'Banion concept ever reached that point of definiteness so as to qualify as protected "information" for trade secret purposes. Nevertheless, we hold that the basic economic components of the O'Banion concept were generally known in the business world and that the combination of the components into the O'Banion concept was not unique but rather was readily ascertainable. Thus, the O'Banion concept does not meet the test for a trade secret. Because we hold that the O'Banion concept did not qualify as a trade secret under either the ATSA, and specifically § 4-75-601(4)(A), or the corresponding Saforo factors due to the fact that it was generally known or readily ascertainable, we need not address the remaining points raised on appeal concerning misappropriation, the trial proceedings, or damages.

Reversed and dismissed.

GLAZE and CORBIN, JJ., not participating.

Special Justice NOYL HOUSTON joins.