CONAGRA, INC., and
ConAgra Poultry Company *v.* TYSON FOODS, INC.

00–446 30 S.W.3d 725

Supreme Court of Arkansas
Opinion delivered November 16, 2000
[Petition for rehearing denied January 4, 2001.]

*Cypert, Crouch, Clark & Harwell*, by: *James D. Cypert, James E. Crouch*, and *Charles L. Harwell*; and *McGrath, North, Mullin & Kratz, P.C.*, by: *Leo A. Knowles, Roger J. Miller*, and *Patrick E. Brookhouser, Jr.*, for appellants.

*Conner & Winters, P.L.L.C.*, by: *Ruth A. Wisener* and *John R. Elrod*; *Shemin Law Firm*, by: *Kenneth Shemin*; and *Jim Blair*, for appellee.

R OBERT L. BROWN, Judge. The appellants, ConAgra, Inc., and ConAgra Poultry Company (referred to jointly as ConAgra), appeal from a decree enjoining them for a period of one year (1) from misappropriating any trade secrets of appellee Tyson Foods, Inc. (Tyson), and (2) from continuing the employment of Jerry Dowd in the sale and marketing of poultry products; Mike Hamblin in the involvement of any type of sales or marketing with Burger King/RSI, KFC/Tricon, and IPC/Subway; and John Curran in the sale and marketing of poultry products. ConAgra raises four points on appeal: (1) that it was error for the trial court to find that trade secrets were involved; (2) that the trial court impermissibly shifted the burden of proof; (3) that the trial court erred in concluding that the trade secrets would be inevitably disclosed; and (4) that the injunction issued by the trial court was overbroad. Because we conclude that the trial court clearly erred in its finding that the information involved constituted trade secrets, we reverse and remand.

Both Tyson and ConAgra are major producers, processors, and marketers of poultry products. Tyson is the world's number one producer with sales of $7.4 billion in fiscal year 1998. ConAgra is the fifth leading poultry producer, although it is engaged in other areas of the food industry. In fiscal year 1998, ConAgra had total food sales of $24.2 billion, with $1.2 billion in sales associated with the poultry industry.

On November 19, 1999, Tyson filed its Second Amended Complaint against ConAgra in which it alleged that ConAgra had "raided" Tyson and hired away three of its top management executives. Those executives were Jerry Dowd, Senior Vice President of

Food Service Distribution; Mike Hamblin, Division Manager of Food Service National Accounts; and John Curran, Senior Vice President and General Manager Consumer Products — Fresh.[1] All three executives, according to the allegations, had access to confidential information, including pricing, pricing programs, cost of goods sold, profit margins, and marketing strategies. The complaint asserted that this information constituted trade secrets; that the trade secrets would be inevitably disclosed contrary to Ark. Code Ann. § 4-75-601 (Repl. 1996); and that ConAgra would use the trade secrets to its competitive advantage. Tyson prayed for injunctive relief against the continued employment of the three executives.

A three-day trial was held, and on January 4, 2000, the trial court issued its decree. In its decree, the trial court found that in 1998, Dowd, Hamblin, and Curran became disgruntled by a reorganization of Tyson's high management, following the resignation of its Tyson CEO, Leland Tollett. On May 20, 1999, Dowd resigned from Tyson and was immediately hired by ConAgra as President of Food Service. On July 6, 1999, Hamblin resigned from Tyson and was immediately hired by ConAgra as Vice President of National Accounts. On July 29 or 30, 1999, Curran resigned from Tyson and was immediately hired as Senior Vice President of Sales and Marketing — Retail Division. Tyson had in effect at the time of the resignations a written Corporate Code of Conduct and Compliance Policy, according to the decree. That Code of Conduct was adopted in the mid-to-late 1990s as part of Tyson's settlement with the Independent Counsel for the United States, who was investigating Tyson's relationship with former United States Secretary of Agriculture, Mike Espy. The Code of Conduct included the following language:

> All Tyson Foods' employees are required to safeguard the Company's confidential business and technical information and use such information only for Company purposes. Failure to observe this duty of confidentiality may additionally result in a conflict of interest or a violation of securities, antitrust, or employment laws. Confidential information whether Tyson Foods' information or the information of others, may further be subject to agreements Tyson Foods has with other companies, trade secret statutes, or

[1] A fourth executive, David Purdle, was originally included in the litigation, but the litigation respecting his misappropriation of Tyson trade secrets was severed from the complaint respecting Dowd, Hamblin, and Curran.

other laws for the protection of such information. In addition to protecting its own trade secrets, it is the policy of Tyson Foods to respect the trade secrets of others. Tyson Foods will not tolerate the violation of confidentiality or secrecy agreements or the improper acquisition of protected information. If a Tyson Foods' employee is furnished with information or becomes aware of information which may have been misappropriated from another party, the employee must immediately contact the legal department.

The trial court then noted the factors involved in determining whether the information is a trade secret. For the most part, those factors are derived from § 4-75-601(4), which reads:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4) (Repl. 1996). The trial court found that Tyson's pricing, pricing programs, cost of goods sold, profit margins, and marketing strategies were trade secrets.

The trial court then turned to the issue of whether these trade secrets had been disclosed. It concluded that even though there was no evidence that ConAgra or the three executives had misappropriated trade secrets, the three executives did have vast knowledge of Tyson's sales and marketing strategies. The court said: "The real issue here is whether any of these three employees can, and will, perform his duties with ConAgra Poultry without using or disclosing some, or all, of Tyson's trade secrets in the process." The court concluded that disclosure of trade secrets by these three executives was inevitable, and for that reason, the court enjoined ConAgra from misappropriating any of Tyson's trade secrets for a period of one year and further from allowing Dowd and Curran to engage in the sale and marketing of poultry for one year and from allowing Hamblin to continue his involvement in a sales or marketing rela-

tionship with Burger King/RSI, KFC/Tricon, and IPC/Subway for the same period of time.

■■ ConAgra first contends on appeal that the trial court clearly erred in finding that the information in question constituted trade secrets sufficient to support an injunction. We agree. Our standard of review in chancery cases is *de novo*. This court has been precise in stating what *de novo* review entails:

> Equity cases are tried de novo on appeal upon the record made in the chancery court, and the rule that this court disposes of them and resolves the issues on that record is well established; the fact that the chancellor based his decision upon an erroneous conclusion does not preclude this court's reviewing the entire case de novo. An appeal in a chancery case opens the whole case for review. All of the issues raised in the court below are before the appellate court for decision and trial de novo on appeal in equity cases involves determination of fact questions as well as legal issues. The appellate court reviews both law and fact and, acting as judges of both law and fact as if no decision had been made in the trial court, sifts the evidence to determine what the finding of the chancellor should have been and renders a decree upon the record made in the trial court. The appellate court may always enter such judgment as the chancery court should have entered upon the undisputed facts in the record.

*Ferguson v. Green*, 266 Ark. 556, 563-64, 587 S.W.2d 18, 23 (1979) (citations omitted). We do not reverse a finding of fact of the chancery court unless we conclude that the chancery court has clearly erred. *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 994 S.W.2d 468 (1999); *Saforo & Assoc., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999). We have said, in addition, that a finding is clearly erroneous when, even though there is evidence to support it, the appellate court is left with the definite and firm conviction that a mistake has been made. *Bendinger v. Marshalltown Trowell Co., supra.*

■ Bearing these standards firmly in mind, we turn then to the applicable criteria for determining whether company information qualifies as a trade secret. Our caselaw has endorsed these factors as integral in making that determination: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the

company to guard the secrecy of the information; (4) the value of the information to the company and to its competitors; (5) the amount of effort or money expended by the appellee in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Saforo & Assoc., Inc. v. Porocel Corp., supra, (citing Vigoro Indus., Inc. v. Cleveland Chem. Co. of Ark.,* 866 F. Supp. 1150 (E.D. Ark. 1994), *aff'd in part, rev'd in part,* 82 F.3d 785 (8th Cir. 1996)). *See also* Ark. Code Ann. § 4-75-601(4) (Repl. 1996).

The focal point of ConAgra's appeal is that Tyson considered certain information to be confidential, but that does not necessarily mean that the information qualifies as a trade secret. In making this argument, ConAgra claims that Tyson failed to meet two of the criteria set out in *Saforo* and in § 4-75-601(4) for determining a trade secret. Specifically, ConAgra asserts that (1) the information in dispute was readily ascertainable by proper means, and (2) Tyson failed to take reasonable steps to keep the information secret. The failure of Tyson to meet both criteria, according to ConAgra, is evidenced by the fact that none of the seven customer contracts that Tyson is able to claim involved trade secrets contained a restriction on those customers to keep pricing information secret.[2] Thus, ConAgra asserts that the information was essentially in the public domain, if there was no proscription against revealing that information to third parties.

■ Tyson's retort to this argument is that disclosure of pricing information by Tyson customers was unlikely because the disclosure of that information would benefit the competitors of those customers. That may be in some cases, but the fact remains that Tyson neglected to include any restriction in its customer contracts which prevented disclosure to third parties. Regardless of whether proof was presented that such disclosure by Tyson customers had transpired, Tyson manifestly failed to take steps to guard the secrecy of this information. Moreover, without a curb or some restriction on its customers, the information was readily ascertainable by third parties from some, if not all, of Tyson's customers. This lapse is important to this court. If Tyson did not consider it necessary to preclude the dissemination of pricing information by its customers,

---

[2] Those customer contracts were with Sysco, Domino's, Burger King/RSI, Subway, Pathmark, Food Lion, and AWG.

why should this court on *de novo* review enforce the secrecy of that same information?

■ But there is a second, more comprehensive aspect of the chancery court's decree which we believe is in error. In finding that Tyson met the criterion of guarding its secrets, the trial court relied solely on Tyson's Corporate Code of Conduct and Compliance Policy and "verbal understandings" with its managers. On *de novo* review, we hold that the chancery court clearly erred in doing so. *See Ferguson v. Green, supra.* The salient part of that Code, as quoted above, relates only to Tyson *employees* and the requirement that they safeguard Tyson's confidential business and technical information. Tyson had not entered into a covenant not to compete with the three executives to be effective for a certain period of time after the three men left Tyson, such as was the case in *Bendinger v. Marshalltown Trowell Co., supra.* Nor did Tyson have a separate confidentiality agreement with these executives which extended the period of time for confidentiality of certain proprietary information for a period of one year after the three men left the company's employment. A separate confidentiality agreement was what was at issue in *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Serv., Inc.*, 336 Ark. 143, 987 S.W.2d 642 (1999). In short, Tyson had in place no protection against postemployment revelation of confidential information by these executives.

In *Cardinal Freight*, we relied on *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), and held that the amount of profit, profit margins, and marketing strategies involved constituted trade secrets. There, certain key employees had resigned from the J.B. Hunt trucking firm and been hired by its competitor, Cardinal Freight. J.B. Hunt sought to protect itself against the disclosure of trade secrets. We concluded that the information involved constituted trade secrets. But in doing so, we took pains to emphasize the reasonable steps that J.B. Hunt had taken to safeguard the profit-margin information and the marketing strategies from disclosure. We said:

> Hunt's CEO Thompson testified that the company's trade secrets are not readily ascertainable by others outside the company. Thompson said that the confidential agreement Hunt requires employees to sign is one way it assures its trade secrets are not passed to others. It is significant, too, that Hunt's agreement limits its employees from disclosing Hunt's information for a period of

one year, which seems patently reasonable for the type of trade secrets covered, especially since the terms of Hunt's customer contracts generally run between one and five years. Thompson also testified that Hunt issues passwords and pass codes to employees who are privy to trade secret information in order to prevent the releasing of such information. Finally, Thompson said that Hunt maintains trade-secret information by the employment of a "loose-lips" policy, which is well known by everyone at Hunt and permits only two Hunt personnel to talk to the media.

*Cardinal Freight*, 336 Ark. at 151, 987 S.W.2d at 646.

■ No comparable protection to assure against postemployment disclosure of confidential information was instituted by Tyson. Though reasonable efforts to protect the secrecy of certain information is only one of the factors we look to in determining the status of a trade secret, it is a prominent one. To reiterate in part, § 4-75-601(4)(B) requires that for information to qualify as a trade secret, it must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." And in *Saforo & Assoc., Inc. v. Porocel Corp., supra*, we listed as a factor the extent of measures taken by the company to guard the secrecy of the information. As best we can tell, there were no efforts on Tyson's part to restrain disclosure of information postemployment. And that distinguishes the facts in this case from the facts in *Cardinal Freight*. Obviously, the failure of a business to protect against the disclosure of information it considers to be secret following employment is critical to our analysis and ultimate decision regarding whether the information is in fact a trade secret.

■ Accordingly, we conclude that the trial court was clearly erroneous in finding that the information at issue qualified as a trade secret. We reverse the decree of the trial court ordering the one-year injunctions and remand for an order to be entered forthwith voiding the injunctions.

Reversed and remanded.