WEIGH SYSTEMS SOUTH, INC.,
and Weigh Systems South II, Inc.
*v.* MARK'S SCALES & EQUIPMENT, INC.,
Mark Moody, and Timoth Young

01-959                                              68 S.W.3d 299

Supreme Court of Arkansas
Opinion delivered March 7, 2002

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.*, by: *John E. Pruniski, III*, for appellants.

*Tatum, Tatum & Riedel*, by: *John Thomas Tatum, II*, for appellees.

RAY THORNTON, Justice. Appellants, Weigh Systems South, Inc., and Weigh Systems South II, Inc. [WSS], are engaged in the business of assembling, fabricating, installing and servicing scales, control and indicating systems that separate and weigh items of food.[1] Appellee, Mark Moody, was employed by WSS from 1992 until 1999. Moody was involved in the management of WSS. Appellee, Timoth Young, was employed by WSS from January 1997 until 1999. Young worked as a service technician at WSS.

After terminating his employment with WSS, Moody formed a new business called Mark's Scales & Equipment, Inc. Young also left WSS and began working for Mark's Scales & Equipment, Inc. The company engaged in the same type of business as WSS.

On November 22, 1999, WSS filed a complaint in the Chancery Court of Yell County seeking damages and injunctive relief against Moody, Young, and Mark's Scales & Equipment, Inc. [appellees]. The complaint alleged that the appellees violated the Arkansas Trade Secrets Act. A temporary restraining order was entered on the date the complaint was filed. The temporary

---

[1] Weigh Systems South II, Inc., and Weigh Systems South, Inc., are the same corporation. Weigh Systems South II, Inc., was established to transform Weigh Systems South, Inc., from a "C corporation" to a "S corporation."

restraining order enjoined the appellees from using WSS computer software and from violating the Arkansas Trade Secrets Act.

On October 23 and 24, 2000, a trial was held on WSS's complaint. On February 12, 2001, the chancellor entered an order dismissing WSS's complaint and vacating the temporary restraining order previously entered. The chancellor found that WSS failed to establish by sufficient evidence that the items claimed to be trade secrets constituted trade secrets pursuant to the Arkansas Trade Secrets Act.

It is from this order that WSS appeals, raising five points on appeal. We affirm the chancellor.

■ ■ Our standard of review in chancery cases is *de novo*. *Conagra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000). We explained in *Conagra* that:

> Equity cases are tried *de novo* on appeal upon the record made in the chancery court, and the rule that this court disposes of them and resolves the issues on that record is well established; the fact that the chancellor based his decision upon an erroneous conclusion does not preclude this court's reviewing the entire case *de novo*. An appeal in a chancery case opens the whole case for review. All of the issues raised in the court below are before the appellate court for decision and trial *de novo* on appeal in equity cases involves determination of fact questions as well as legal issues. The appellate court reviews both law and fact and, acting as judges of both law and fact as if no decision had been made in the trial court, sifts the evidence to determine what the finding of the chancellor should have been and renders a decree upon the record made in the trial court. The appellate court may always enter such judgment as the chancery court should have entered upon the undisputed facts in the record.

*Id.* (citing *Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979)). We have also noted that we do not reverse a finding of fact of the chancery court unless we conclude that the chancery court has clearly erred. *Saforo & Assoc., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999). A finding is clearly erroneous when, even though there is evidence to support it, the appellate court is left with the definite and firm conviction that a mistake has been made. *Id.*

In its first point on appeal, WSS argues that the chancellor erred when he determined that WSS failed to take adequate steps to protect its proprietary information. In its second point on appeal, WSS argues that appellees misappropriated certain proprietary information which constituted trade secrets. In support of its arguments, WSS asserts that its customer lists, vendor list, pricing information, computer software, service agreement inventory checklist, and marketing plans constitute trade secrets.

We first address the threshold issue of whether WSS had trade secrets which appellees misappropriated. The Arkansas Trade Secrets Act, Ark. Code Ann. § 4-75-601 to -607 (Repl. 2001), defines a "trade secret" as:

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) *Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*

Ark. Code Ann. § 4-75-601 (Repl. 2001) (emphasis added).

We have identified several factors which we find material to our determination of whether information is a trade secret. These factors include: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and to its competitors; (5) the amount of effort or money expended by the company in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Saforo, supra.*

WSS contends that its customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software constitute trade secrets under the six criteria outlined in *Saforo, supra,* and therefore this information is a trade secret pursuant to the Arkansas Trade Secrets Act. To determine

whether WSS had trade secrets that appellees misappropriated, it is necessary to consider the six factors articulated in *Saforo* to the facts surrounding this case.

First, we determine the extent to which WSS's customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software were known outside the business. WSS concedes that some or all of its customer lists appear in directories or are available on the internet. WSS also concedes that the vendors on its vendor list may be located using the internet.

■ The testimony at trial established that the service agreement checklist prepared by WSS merely contained a list of the equipment owned by each customer. The testimony further established that WSS's marketing plan was established by visiting trade shows and talking with customers about upcoming projects. Finally, the trial testimony established that the computer software installed by WSS was routinely but not always password protected. We conclude that the finding of the chancellor relating to this factor was not clearly erroneous.

■ Second, we consider the extent to which WSS's customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software were known by employees and others involved in the business. Primarily, WSS's customer lists, vendor list and pricing information were maintained on password protected computers. However, at trial, Wade Jones, one of the owners of WSS, explained that in the summer of 1999, he, Timoth Young, Mark Moody, and people who worked in the parts room had access to WSS's vendor list. He also testified that the accounts payable department had access to WSS's customer lists, and that there were printed copies of the customer lists. Jones further testified that hard copies of the pricing information are maintained by WSS's "service people." He additionally noted that the service agreement inventory checklist is kept by the service manager and the service technicians. Finally, Jones explained that the information in the marketing plan was available to the individuals who managed WSS. The finding by the chancellor that WSS failed to take adequate steps to protect its proprietary information was not clearly erroneous.

■ The chancellor also considered the extent of measures taken by WSS to guard the secrecy of its customer lists, vendor list,

pricing information, service agreement inventory checklist, marketing plans, and computer software. Although this factor is only one of the factors we look to in determining the status of a trade secret, we consider it to be a prominent factor. *Conagra, supra.* In *Conagra,* we refused to recognize information as a trade secret when the company made no effort to restrain disclosure of the information post-employment. *Id.* Specifically, we explained:

> [T]he failure of a business to protect against the disclosure of information it considers to be secret following employment is critical to our analysis and ultimate decision regarding whether the information is in fact a trade secret.

*Id.*

We now review the facts surrounding WSS's efforts to protect its information. As we have previously noted, the information contained in WSS's customer lists and vendor list was available on the internet. Additionally, as noted by the chancellor, WSS's pricing information, customer lists, and vendor list were readily available in hard copy format. Finally, it is apparent that WSS's marketing plans and service agreement inventory checklist were readily available to individuals employed by WSS.

The chancellor's findings that the secrecy of WSS's computer software was compromised was not clearly erroneous. Specifically, WSS did not require its customers to sign licensing agreements or confidentiality agreements at the time the software was purchased. WSS also sold customers computer programs which allowed the customer to transfer WSS's software from one machine to another. Additionally, the trial testimony established that although WSS technicians were supposed to change the default password to a password known only by WSS when software was installed, this procedure was not always followed. The testimony further established that it was not uncommon for employees of WSS to provide the customer with the WSS password. There was also testimony that a computer "bug" existed in WSS's software that allowed the customer to gain access to the program without using a WSS password and that WSS did not swiftly act to correct the "bug."

■ Additionally, the information WSS claims to be proprietary in nature was not protected from post-employment disclosure.

Specifically, WSS did not require its employees to sign confidentiality agreements nor did WSS require its employees to enter into covenants not to compete.[2] WSS took no significant or effective steps to protect the disclosure of its customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, or computer software. We conclude that the finding of the chancellor with respect to the failure to protect from post-employment disclosure was not clearly erroneous.

Next, we consider the value of WSS's customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software to WSS and its competitors. Wade Jones testified that when he started WSS he initially purchased a customer list for $25,000. Jones further testified that WSS invests approximately $100,000 to $150,000 annually in software development. WSS did not provide evidence as to the value of its vendor list, pricing information, service agreement inventory checklist, or marketing plan; instead WSS contends that this information has been developed over time and is essential to WSS when it is making quotes on jobs or fabricating or installing equipment.

With regard to the value of WSS's customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software to its competitors, WSS argues that appellees benefitted greatly from the information. Specifically, WSS contends that because appellees provided services for customers on WSS's customer lists, and because appellees used vendors that were on WSS's vendor list, WSS's lists were very valuable to appellees. However, WSS did not provide any evidence as to the value of this information to appellees. Additionally, as found by the chancellor, because the information contained in WSS's customer lists and vendor list was readily available from other sources, appellees did not have to rely on WSS's customer lists or vendor list to ascertain this information.

Fifth, we consider the amount of effort or money expended by WSS in developing its customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software. As noted above, Wade Jones purchased a customer list for WSS at a cost of $25,000. Further, as

---

[2] We note that WSS argues that it required it employees to sign a "non-compete agreement." However, appellees Moody and Young both testified that they did not sign an agreement.

noted above, there was testimony that WSS invested approximately $100,000 to $150,000 annually in software development. WSS argues that it also updates its vendor and pricing information continuously. We conclude that expenditures on information which was not protected as a trade secret is not accorded the status of a trade secret.

Finally, we consider the ease or difficulty with which WSS's customer lists, vendor list, pricing information, service agreement inventory checklist, marketing plans, and computer software could be properly acquired or duplicated by others. Once again, we note that the information available in WSS's customer lists and vendor list was available on the internet. Thus, this information was easily acquired or duplicated by others. Next, we note that the information contained in WSS's service agreement inventory checklist, pricing lists, and marketing plan was readily available to numerous WSS employees. These employees were not required to sign confidentially agreements or non-compete agreements. Therefore, this information was easily duplicated by others. Finally, the trial testimony established that WSS's computer software could be easily duplicated by anyone with the computer's service manual.

After reviewing the facts in the case now before us, we conclude that the chancellor did not err in finding that the information WSS seeks to protect is not a trade secret. Specifically, we conclude that the information contained in WSS's customer lists, vendor list, pricing list, service agreement inventory checklist, marketing plans, and computer software is information which is generally known or readily ascertainable. We further hold that WSS did not take adequate steps to protect the information from being acquired or duplicated by others. Because the information is not a trade secret, we conclude that appellees did not misappropriate the information from WSS. Accordingly, the chancellor is affirmed.

Because we have determined that WSS did not have proprietary information which would qualify as a trade secret under either the Arkansas Trade Secrets Act or the factors articulated in *Saforo*, we need not address the remaining points raised on appeal concerning injunctive relief, monetary damages, or attorney's fees. *See Wal-Mart Stores, Inc. v. The P.O. Market, Inc.*, 347 Ark. 651, ___ S.W.3d ___ (February 14, 2002).

Affirmed.