TYSON FOODS, INC. *v.* CONAGRA, INC.,
and ConAgra Poultry Co.

01-737                                        79 S.W.3d 326

Supreme Court of Arkansas
Opinion delivered June 27, 2002

*Conner & Winters, P.LLC,* by: *William B. Putman* and *Ruth A. Wisener;* and *Quattlebaum, Grooms, Tull & Burrow, PLLC,* by: *Leon Holmes,* for appellant.

*McGrath, North, Mullin & Kratz, P.C.*, by: *Leo A. Knowles* and *Patrick E. Brookhouser, Jr.*, and *Cypert, Crouch, Clark & Harwell*, by: *James E. Crouch*, for appellee Con Agra, Inc.

*Everett Law Firm*, by: *John C. Everett* and *Jason H. Wales*, for appellee ConAgra Poultry Co.

ROBERT L. BROWN, Justice. Appellant Tyson Foods, Inc., appeals the granting of a motion for judgment notwithstanding the verdict in favor of appellees ConAgra, Inc., and ConAgra Poultry Co. (both companies referred to collectively in this opinion as ConAgra). Tyson essentially mounts two arguments in its appeal: (1) that Arkansas law does not invariably require employers to enter into postemployment confidentiality agreements with departing employees for company information to qualify as a trade secret, and (2) Tyson's nutrient profile qualifies as a trade secret. We affirm the trial court's order granting the motion for judgment notwithstanding the verdict, but we do so for reasons other than those stated by the trial court in its order.

In 1984, David Purtle began his employment with Tyson.[1] At the time of his resignation from Tyson in 1999, Purtle held the position of Senior Vice-President in charge of Retail Poultry. In 1997, he directed Dr. Roy Brister, Vice-President of Nutrition Research at Tyson, to develop two nutrient profiles (described as "normal" and "reduced") for use in formulating Tyson's poultry feed to avoid having different nutrient profiles at each Tyson complex. Dr. Brister did so. The two profiles were compiled into a single document, the "nutrient profile," which Tyson used to formulate feed for its chickens, based on varying combinations and levels of amino acids. In June 1999, Purtle left Tyson and began his employment with ConAgra, because he had become unhappy with a reorganization of management at Tyson. Soon after he began work with ConAgra, Purtle gave ConAgra the Tyson nutrient profile, which ConAgra then implemented.

That same year, Tyson initiated trade-secret litigation against ConAgra in which it contended that ConAgra had "raided" Tyson and hired away four top management executives, including

---

[1] Purtle had been employed by Tasty Bird, which was acquired by Tyson in 1984.

Purtle, and that those executives would inevitably divulge or had divulged trade secrets to ConAgra. Tyson's prayer for relief included an injunction against disclosure of Tyson's trade secrets and damages for misappropriation of the same. Allegations against Purtle were severed, because it was alleged that he had actually given trade secrets to ConAgra. The trial of the remaining three executives proceeded. The trial court in that trial found that certain pricing information and marketing strategies were trade secrets, and it enjoined the three former Tyson executives from revealing those trade secrets for a period of one year. This court reversed and held that the trial court erred in granting the injunction, because Tyson had made no efforts to restrain disclosure of information postemployment. *See ConAgra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000) (*Tyson I*).

The case involving Purtle was tried in October 2000, and a jury was impaneled, though the matter was in chancery court. Evidence was presented on (1) whether the nutrient profile was a trade secret; (2) whether it was misappropriated; and (3) what damages may have resulted from a misappropriation. Following a trial on liability, the trial court found that the "nutrient profile" was a trade secret under Arkansas law and was misappropriated. The trial court so instructed the jury, and the matter of damages was submitted to a jury. The jury returned a verdict in favor of Tyson for trade secret misappropriation in the amount of $20,094,531. On October 26, 2000, the trial court entered a judgment in the amount of $20,094,531 against ConAgra.

On November 8, 2000, ConAgra filed a Motion for Judgment Notwithstanding the Verdict, or Alternatively, Motion for Remittitur or New Trial. On December 7, 2000, the trial court entered its Order Regarding Trade Secret Misappropriation, which included the following findings:

1. That Tyson's nutrient profile (the "Profile") is a formula, and

2. The Profile has independent economic value from not being generally known; and

3. The Profile is not readily ascertainable because it is not readily available on the open market and it is not capable of being reverse engineered; and

4. Tyson took reasonable efforts to protect the secrecy of the Profile by instituting Tyson's Code of Conduct and Compliance Policy that contains a confidentiality provision, by having verbal understandings with its employees and by taking other measures that are equivalent to those standards in the industry.

Also on December 7, 2000, and because of this court's decision in *Tyson I*, which was handed down on November 16, 2000, the trial court granted the motion for judgment notwithstanding the verdict and concluded that *Tyson I* "appears to require a written contract prohibiting postemployment disclosure of information and upon no other grounds."

On December 29, 2000, the trial court entered an Order of Modification *nunc pro tunc*, adding two additional findings to the December 7, 2000 Order Regarding Trade Secret Misappropriation:

5. The Profile constitutes a trade secret under the ATSA.

6. Because David Purtle supplied the Profile to ConAgra which immediately implemented it without the knowledge or permission of Tyson, the Profile was misappropriated pursuant to the ATSA.

It is from the order of December 7, 2000, granting the motion for judgment notwithstanding the verdict and the modification order of December 29, 2000, that Tyson appeals. However, we note that the December 7, 2000 Order Regarding Trade Secret Misappropriation, as modified, was favorable to Tyson. The second December 7, 2000 order was the grant of the motion for a judgment notwithstanding the verdict. Tyson urges that this court reverse the trial court's order granting the motion for judgment notwithstanding the verdict and reinstate the jury's original damage award. ConAgra filed a notice of cross-appeal and in its brief argued before this court that Tyson's proof could not support the verdict and judgment.

We first admit to some confusion over the postjudgment relief requested by ConAgra in the form of a judgment notwithstanding the verdict or, alternatively, motion for remittitur or new trial. Part of our confusion may relate to impaneling a jury in chancery court. It appears clear to us that it was the trial court that first concluded that the nutrient profile was a trade secret that was misappropriated by Purtle and so instructed the jury. The trial court then submitted the issue of damages to the jury. The jury found that Tyson had been damaged and in what amount. This all seems akin to a judge directing a verdict in favor of a plaintiff with the jury fixing damages. In effect, ConAgra's post-trial motion was a motion for the trial court to reconsider its December 7, 2000 Order Regarding Trade Secret Misappropriation in light of this court's decision in *Tyson I*. Thus, we will treat the motion for judgment notwithstanding the verdict as one for reconsideration of the trial court's original order based on our decision in *Tyson I*.

The question then becomes: what is this court's standard of review for the trial court's order granting ConAgra's motion for judgment notwithstanding the verdict? The trial court read our decision in *Tyson I* as requiring a reversal of its initial ruling as a matter of law. The trial court reversed itself solely for the reason that it believed it was mandated to do so by *Tyson I*, due to the absence of a postemployment confidentiality agreement.

Our standard of review in chancery cases is *de novo*. *See Tyson I; Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979). As we said in *Tyson I*:

> All of the issues raised in the court below are before the appellate court for decision and trial de novo on appeal in equity cases involves determination of fact questions as well as legal issues. The appellate court reviews both law and fact and, acting as judges of both law and fact as if no decision had been made in the trial court, sifts the evidence to determine what the finding of the chancellor should have been and renders a decree upon the record made in the trial court. The appellate court may always enter such judgment as the chancery court should have entered upon the undisputed facts in the record.

342 Ark. at 677, 30 S.W.3d at 728-29 (quoting *Ferguson, supra,* 266 Ark. at 564, 587 S.W.2d at 23 (1979) (citations omitted)). We have further stated that we do not reverse a chancery court's findings of fact unless we conclude the chancery court has clearly erred. *See Tyson I; Bendinger v. Marshalltown Trowell Co.,* 338 Ark. 410, 994 S.W.2d 468 (1999). Accordingly, our standard of review in this case is *de novo,* but we will apply the clearly-erroneous standard to any findings of fact made by the trial court.

*a. Postemployment confidentiality agreement.*

Turning to the merits, we first consider whether the trial court erred in concluding that this court held in *Tyson I* that a postemployment confidentiality agreement be signed in all instances as an absolute prerequisite for trade-secret status and protection. We hold that the trial court did err in this regard. Our decision in *Tyson I* was not limited to the failure to have a postemployment contract. Rather, we concluded:

> As best we can tell, there were *no efforts* on Tyson's part to restrain disclosure of information postemployment. And that distinguishes the facts in this case from the facts in *Cardinal Freight.* Obviously, the failure of a business to protect against the disclosure of information it considers to be secret following employment is critical to our analysis and ultimate decision regarding whether the information is in fact a trade secret.
>
> Accordingly, we conclude that the trial court was clearly erroneous in finding that the information at issue qualified as a trade secret. We reverse the decree of the trial court ordering the one-year injunctions and remand for an order to be entered forthwith voiding the injunctions.

*Tyson I,* 342 Ark. at 680, 30 S.W.3d at 730-31 (emphasis added).

In holding as we did, we relied on our opinion in *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Serv., Inc.,* 336 Ark. 143, 987 S.W.2d 642 (1999). In *Cardinal Freight,* we alluded to a postemployment confidentiality agreement for one year as being one way a company could protect trade secrets. We also emphasized measures taken by the company during the employee's employment to protect the secrecy of its information. J.B. Hunt, in that case, had passwords and passcodes in place to protect trade-secret

information and had adopted a "loose-lips" policy to restrict public disclosure of confidential information.

■ In short, we did not specifically require in *Cardinal Freight* or in *Tyson I* that a postemployment confidentiality contract be entered into in all instances to identify trade secrets and to protect them. That was simply one measure to which we referred that could be taken by the company to assure trade-secret protection postemployment. However, as we made clear in *Tyson I*, no efforts had been taken by the company to restrain the disclosure of information postemployment. And that was determinative.

*b.    Trade-Secret Protection.*

Having concluded that a postemployment confidentiality agreement is not an absolute requirement in all instances for trade-secret protection, we now consider whether the trial court was right to rule in favor of ConAgra on its motion for judgment notwithstanding the verdict, albeit for the wrong reason. *See Norman v. Norman*, 347 Ark. 682, 66 S.W.3d 635 (2002); *Ouachita Trek & Dev. Co. v. Rowe*, 341 Ark. 456, 17 S.W.3d 491 (2000); *Malone v. Malone*, 338 Ark. 20, 991 S.W.2d 546 (1999). In this regard, we examine what steps Tyson took both during Purtle's employment and postemployment to identify the nutrient profile as a trade secret and to protect it. Tyson urges that it did take pains to protect its confidential information and points to its Corporate Code of Conduct and Compliance Policy (Corporate Code) as evidence of that fact.

As we noted in *Tyson I*, Tyson adopted the Corporate Code in the mid-to-late 1990s as an outgrowth of the special prosecutor's investigation into the affairs of Michael Espy and Tyson. The Corporate Code includes various legal and ethical principles, and its purpose, according to its foreword written by Tyson's then chairman and CEO, is "to help us at Tyson Foods make ethical business decisions." The Corporate Code deals with Conflicts of Interest, Confidential Information, Corporate Records, Relationships with Government Personnel, Political Contributions, International Transactions, Antitrust Compliance, Environmental Compliance, and Reporting of Violations. Employees were asked

to read the code and then sign a statement to the effect that they had done so. They further attend a class every year in which the Code is discussed. No contractual agreement was required between the company and its employees mandating that the employees would keep certain information confidential.

The pertinent provision of the Corporate Code for our purposes is the section entitled "Confidential Information":

> 1. Proprietary Information
>
> All Tyson Foods' employees are required to safeguard the Company's confidential business and technical information and use such information only for Company purposes. Failure to observe this duty of confidentiality may additionally result in a conflict of interest or a violation of securities, antitrust, or employment laws. Confidential information, whether Tyson Foods' information or the information of others, may further be subject to agreements Tyson Foods has with other companies, trade secret statutes, or other laws for the protection of such information. In addition to protecting its own trade secrets, it is the policy of Tyson Foods to respect the trade secrets of others. Tyson Foods will not tolerate the violation of confidentiality or secrecy agreements or the improper acquisition of protected information. If a Tyson Foods' employee is furnished with information or becomes aware of information which may have been misappropriated from another party, the employee must immediately contact the Legal Department.

It is clear from a reading of this language that Tyson did not necessarily equate confidential information to a trade secret. More was required under our trade-secret statutes.

We turn then to an examination of our trade-secret law. Section 4–75–601(4) of Arkansas's Unfair Practices Code defines a "trade secret" as:

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4) (Repl. 2001).

■ ■ In addition to the statute, this court has endorsed a six-factor analysis in determining whether information qualifies as a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and to its competitors; (5) the amount of effort or money expended by the appellee in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Tyson I. See also Weigh Sys. S., Inc. v. Mark's Scales & Equip., Inc.*, 347 Ark. 868, 68 S.W.3d 299 (2002); *Wal-Mart Stores, Inc. v. P.O. Market, Inc.*, 347 Ark. 651, 66 S.W.3d 620 (2002); *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999); *Restatement of Torts* § 757, cmt. b. As to the third factor, which is the extent of measures taken by the company to guard the secrecy of the information, this court held in *Tyson I* that "the failure of a business to protect against the disclosure of information it considers to be secret following employment is critical to our analysis and ultimate decision regarding whether the information is in fact a trade secret." *Tyson I*, 342 Ark. at 680, 30 S.W.3d at 731. Here, Tyson maintains that it took reasonable efforts to guard the secrecy of its nutrient profile. We disagree.

Tyson specifically argues that Purtle admitted that he considered the nutrient profile to be confidential and that he instructed others that it was. Further, Tyson claims that Purtle knew of his obligation to keep such information secret because of the Corporate Code. Tyson also asserts that the nutrient profile was an internal document and was not part of any third-party customer contract. Moreover, it contends that, according to Dr. Brister, only five people at Tyson retained a hard copy of the nutrient profile. ConAgra counters this by urging that while Purtle thought the nutrient profile was confidential, he testified that he never considered it to be a trade secret. ConAgra also points to Purtle's

testimony that hundreds of Tyson managers in the field were given a hard copy of the nutrient profile, without an admonition of confidentiality, which undercuts any notion that the profile was a trade secret.

We turn then to an examination of the efforts taken by Tyson to keep the nutrient profile secret, both during Purtle's employment and after he left to join ConAgra. Certainly, covenants not-to-compete and confidentiality agreements would have been active efforts on the part of Tyson to protect proprietary information it considered to be a trade secret. *See Weigh Sys. S., Inc. v. Mark's Scales & Equip., Inc., supra; Tyson I, supra.* However, those steps are not the only options available to a company. Melvin F. Jager, in his treatise, *Trade Secrets Law*, sets out other options, in addition to publishing corporate ethical principles, which would be acceptable measures for a company to institute to protect secret information. Those measures include detailed record-keeping procedures, physical security, confidentiality agreements, vendor and supplier confidentiality agreements, use of confidential stamps and legends, computer security measures like passwords, and the use of entrance and exit interviews. *See* 1 Melvin F. Jager, *Trade Secrets Law* § 5.05[2][c] (2001).

The treatise, *Milgrim on Trade Secrets*, details a variety of precautionary steps that have been implemented by trade-secret owners to protect secret information: use of techniques to put employees on notice of the trade-secret status of the matter on which they are working; posting of warning or cautionary signs or use of document legends; restricting visitors; maintaining internal secrecy by dividing the process into steps and separating the various departments working on the several steps; using unnamed or coded ingredients; keeping secret documents under lock; and limiting access to computer materials by use of passwords to prevent unauthorized access and keeping magnetic tapes, flow charts, symbolics and source codes under lock and key when not in use. *See* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.04 (2001).

The South Dakota Supreme Court has also discussed reasonable precautions for maintaining secrecy when a feed supplement was at issue:

In addition, there was no substantial evidence showing Weins took reasonable efforts to maintain his product's secrecy. SDCL 37-29-1(4)(ii). Secrecy is fundamental to the existence of a trade secret. *Pioneer Hi-Bred Int'l*, 35 F.3d at 1235. Although the secrecy is not required to be absolute, reasonable precautions must be taken. *Id.* Regarding such precautions, the Appellate Court of Illinois held:

> [N]o evidence exists to show that plaintiff took any affirmative measures to keep its [product] secret. No evidence was presented regarding internal or external physical security; that confidentiality agreements or understanding existed among those having access to plaintiff's [product]; that plaintiff's [product] contained confidentiality stamps or [was] kept under lock and key; or that employees received entrance and exit interviews imparting the importance of confidentiality. Consequently, we conclude that plaintiff failed to produce sufficient evidence to prove that under [the relevant section] of the [Trade Secrets] Act, its [product] was the subject of reasonable efforts designed to protect its secrecy.

*Gillis Associated Indus. v. Cari-All*, 206 Ill. App.3d 184, 151 Ill. Dec. 426, 431, 564 N.E.2d 881, 886 (1990) (applying the same subsection as SDCL 37-29-1(4)(ii)).

*Weins v. Sporleder*, 569 N.W.2d 16, 27 (S.D. 1997).

█ Tyson failed to take any precautionary measures to protect its nutrient profile. The Corporate Code at Tyson, for example, hardly qualifies as an agreement between Tyson and Purtle not to disclose the nutrient profile. Nor were any other measures, such as those listed above, implemented. Donald "Buddy" Wray, the former President of Tyson, and a current member of its Board of Directors, summarized Tyson's efforts:

> COUNSEL: I had forgotten to ask you a question. Oh, I want to go back to the issue of Tyson's code of conduct—Corporate Code of Conduct. Do you remember the question about the Corporate Code of Conduct?
>
> WRAY: Yes, sir.
>
> COUNSEL: Did Tyson do anything else or rely upon anything else, other than the Corporate Code of Conduct, with respect to

keeping the confidentiality of its proprietary information or alleged trade secrets?

WRAY: I don't think Tyson would be any different than anyone else. You can have a signed document, but you have to trust your people and believe in their honesty and in their integrity.

COUNSEL: Have you heard Mr. Manuel comment one way or another as to what he believes the standard in the industry is with respect to maintaining confidentiality of proprietary information and alleged trade secrets?

WRAY: I think his words were that they had to depend on the honesty or the character and integrity of their people.

Wray also testified that Tyson's Corporate Code did not list items like the nutrient profile it considered to be confidential in the Corporate Code. Finally, Wray admitted that there was no time for an exit interview with Purtle. Of course, an exit interview could have been used to discuss matters Tyson believed were proprietary.

Dr. Roy Brister, Vice President of Tyson's Nutrition Research, testified that only five employees had a hard copy of the nutrient profile, but he admitted that many other Tyson employees had seen it on an overhead projector because the nutrient profile was used as a tool to educate the upper management of Tyson's complexes. Apparently, one reason for showing the nutrient profile was so the managers could choose between the normal or the reduced profile. Dr. Brister could not say whether those managers were told about the confidential nature of the profile. Purtle added that these meetings with Tyson managers out in the field probably involved a total of four hundred to four hundred and fifty people. He contradicted Dr. Brister's testimony and stated that most of the field managers were given a hard copy of the nutrient profile.

█ Tyson bears down hard on the fact that Purtle admitted that he knew the nutrient profile was confidential. The fact that Purtle himself believed the nutrient profile to be confidential, however, as well as the fact that Dr. Brister testified that Purtle told him he thought the profile possessed economic value do not decide the issue for us. Purtle also testified that he did not believe

the nutrient profile was a trade secret. We believe that it was incumbent on Tyson to clearly identify what information it considered to be a trade secret, as that is a legal status fixed by statute. Moreover, we draw a clear distinction between actions taken by Tyson to protect trade secrets on the one hand and understandings of individual officers like Purtle in determining whether information was confidential and had value on the other. As discussed above, the six *Saforo* factors contemplate that it is the efforts taken by the *company* to safeguard the information that is critical, not the perception of individual officers. Absent clear corporate action to protect the nutrient profile as a trade secret, a subjective belief of an individual employee that the information is confidential or even had value seems largely irrelevant in our analysis. We note once more that even the Corporate Code distinguished confidential information from a trade secret.

█ In sum, the efforts taken by Tyson to safeguard the information comes down to (1) the Corporate Code and Tyson's directive to its employees that the Code be read, and (2) the company's faith in the integrity of its employees. Yet, hundreds of Tyson managers were educated about the nutrient profile and there was no proof that Tyson took any steps to swear them to secrecy, or warn them of the confidential nature of the profile. Relying on an ethical guide like the Corporate Code, which fails to identify what is a trade secret or to mention the nutrient profile, is simply not enough for Tyson to invoke trade-secret protection.

█ We hold that the trial court clearly erred in finding that the nutrient profile was a Tyson trade secret and that the trial court was correct to reverse itself by granting the motion for judgment notwithstanding the verdict, albeit the court's reason for doing so was erroneous. Because we affirm the order granting the motion for judgment notwithstanding the verdict, ConAgra's cross-appeal on damages is moot.

Affirmed.

THORNTON, J., dissents.

R AY THORNTON, Justice, dissenting. The trial court found that Tyson Food's nutrient profile was a trade

secret belonging to Tyson Foods and that David Purtle, Senior Vice-President in charge of Retail Poultry at Tyson, misappropriated the secret formula when he left the company. A few days after Mr. Purtle left Tyson, the former senior vice-president delivered the secret formula to Tyson's competitor, ConAgra, of which company he had just been named President of Retail Sales. Mr. Purtle gave the confidential profile to Dr. Dorr, the nutritionist for ConAgra, and told him to "implement this," and Dr. Dorr immediately took steps to implement the Tyson nutrient formula at ConAgra.

The question of damages to Tyson by ConAgra's use of the nutrition formula was fixed by the jury at more than twenty million dollars, and ConAgra sought a remittitur to reduce the judgment to the 1.3 million dollars, which was the amount that ConAgra testified they saved by using Tyson's nutrient profile.

Notwithstanding its findings of fact and the verdict of the jury, the trial court granted ConAgra's motion for a JNOV based upon a misinterpretation of our holding in *Conagra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000), (hereinafter *Tyson I*). The trial court erroneously concluded that an action for damages for the misappropriation of a trade secret could not be maintained unless the company had implemented written post-employment, non-competition agreements. The trial court reaffirmed all its findings as to the existence of a trade secret and its misappropriation but set aside the jury verdict and consequent damages on the sole ground that our decision in *Tyson I* required that extraordinary action.

I agree with the majority's conclusion that a JNOV was not required by our decision in *Tyson I* and that the trial court erred in setting aside the verdict on the basis of its erroneous interpretation of our *Tyson I* decision.

The conclusion by the majority that a JNOV was not required should have the effect of reinstating the earlier findings by the trial court and the verdict by the trial court and the jury unless, in our *de novo* review we determined that the earlier findings by the trial court were clearly erroneous. These earlier findings were specifically repeated when the trial court erroneously

reversed itself based on its misinterpretation of the legal principals articulated in our *Tyson I* opinion. We do not reverse a finding of fact by the chancery court unless it is clearly erroneous. *Weigh Systems South v. Mark's Scales & Equipment, Inc.*, 347 Ark. 868, 68 S.W.3d 299 (2001). A finding of fact by the chancery court is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

While I agree with the majority that the trial court erred in its application of *Tyson I*, I believe the effect of that conclusion necessitates the reinstatement of the trial court's earlier findings and the jury verdict. However, I disagree with the majority's conclusion that a review of the evidence supporting the findings made by the trial court reflect that those findings were clearly erroneous, and I respectfully dissent. I believe that each of the trial court's findings was based upon convincing evidence and that the trial court's findings were not clearly erroneous.

In my analysis of the issues before the trial court, I will first address whether the trial court's finding that the nutrient profile was a trade secret was clearly erroneous. Next, I will consider whether the trial court's finding that the trade secret was misappropriated and that damages resulted from the misappropriation was clearly erroneous. Finally, I will consider whether the jury's determination that Tyson suffered damages as a result of the misappropriation and conversion of its nutrient formula was clearly erroneous.

*Was the trial court clearly erroneous in finding that the nutrient profile formula is a trade secret?*

I.   *Saforo* Analysis

In *Tyson I*, this court listed the six factors from *Saforo & Assoc. Inc., v. Porocel Corp.*, 337 Ark. 553, (1999) to be used to determine whether company information qualifies as a "trade secret": (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value

of the information to the company and to its competitors; (5) the amount of effort or money expended by the appellee in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id. See,* Ark. Code Ann. § 4-75-601(4).[1]

In interpreting this statute we have listed six factors to be considered. *Saforo, supra.* I will examine each of the six criteria presented in *Soforo, Id.*

The first factor is the extent to which the information is known outside the business. There was no evidence that the Tyson nutrient profile was known by anyone outside of Tyson until David Purtle took a copy of the profile from his desk at Tyson and shared that copy with ConAgra. Mr. Purtle testified that as an officer of Tyson, he instructed the nutritionists of Tyson to develop the formula and to keep it confidential because it gave Tyson a competitive advantage in the cost of feeding chickens.

The testimony of Dr. Brister, the Tyson nutritionist who led the development of the formula, was that there were only five hard copies of the nutrition formula, and that they were treated as confidential by the five nutritionists who used them in developing appropriate feed mixes. It is true that the existence of the confidential formula was disclosed by means of an overhead projector to other Tyson employees, all of whom had signed a confidentiality agreement. There is no evidence that the confidential nutritional formulas had been seen or discovered by anyone other than a Tyson employee until Mr. Purtle took his copy from his desk at Tyson and delivered it to ConAgra with instructions to implement it for that company's benefit.

The trial court's finding relating to the first *Saforo* factor that the information was not known outside of Tyson is certainly not clearly erroneous.

---

[1] "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
    (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The second factor of the *Saforo* test is the extent to which the information is known by employees and others involved in the business. Here, the development of the confidential nutritional formula was accomplished by five Tyson nutritionists who were instructed to keep the formula confidential by Mr. Purtle. Furthermore, Dr. Roy Brister, Tyson's nutritionist, stated that Tyson has between 65,000 and 70,000 employees but that "I would say five people have a copy of this sheet [the formula]." Dr. Brister further stated, "if there is one document in the nutrition department I could protect from disclosure, it would be our nutrient profile."

The trial court was not clearly erroneous in concluding that the evidence showed that the confidential formula was closely guarded, satisfying this element of the *Saforo* criteria.

The third factor in the *Saforo* analysis is to examine the extent of the measures taken by the company to guard the secrecy of the information. This third factor was given particular emphasis by this court in *Tyson I*, a case that related to price lists that were generally available to any purchaser. We stated:

> Though reasonable efforts to protect the secrecy of certain information is only one of the factors we look to in determining the status of a trade secret, it is a prominent one. To reiterate in part, § 4-75-601(4)(B) requires that for information to qualify as a trade secret, it must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy. And in *Saforo & Assoc., Inc. v. Porocel Corp.*, *supra*, we listed as a factor the extent of measures taken by the company to guard the secrecy of the information. As best we can tell, there were no efforts on Tyson's part to restrain disclosure of [price list] information post-employment. And that distinguishes the facts in this case from the facts in *Cardinal Freight*. Obviously, the failure of a business to protect against the disclosure of information it considers to be secret following employment is critical to our analysis and ultimate decision regarding whether the information is in fact a trade secret.

*Tyson I*, *supra*. By no means did this court hold in *Tyson I* that simply because there was no written post-employment agreement of confidentiality or covenant not to compete, there could be no

trade secret. We considered that factor as a part of our analysis of whether or not Tyson took steps to keep price lists a secret.

In the case before us, while there was no covenant not to compete, or a post–employment agreement not to divulge trade secrets, there were valid measures taken by Tyson to guard the secrecy of the nutrient profile. First, unlike the price lists involved in *Tyson I*, the nutrient profile was not made public. Next, the corporate code of conduct required current employees to guard the secrecy of Tyson's confidential information. This code of conduct was a means by which Tyson instructed its employees that certain information was meant to be kept secret. Post–employment confidentiality contracts are only one way in which to indicate to employees that information should be kept confidential, and even *Tyson I* does not hold that post–employment contracts are necessary to support a finding that there was a trade secret. Here the court considered convincing evidence that Mr. Purtle knew the nutrition profile was confidential, instructed the nutritionists to safeguard the information, and signed the corporate code of conduct protecting confidential information. The trial court's finding that this prong of the *Saforo* test was met, and that there were sufficient measures taken by Tyson to guard the secrecy of the information was not clearly erroneous.

The fourth factor in determining whether the information is a trade secret is the value of the information to the company and to its competitors. The value of the nutrient profile to the company was shown by ConAgra's reduced costs due to the implementation of the nutrient profile. ConAgra testified that it saved 1.3 million dollars by using the nutrient profile. Purtle told Dr. Dorr at ConAgra to implement the nutrient profile, and therefore the trial court was not clearly erroneous in finding that ConAgra implemented the profile because it was useful and valuable. Indeed, it is ConAgra who asks this court for a remittitur of the damages to the 1.3 million dollar amount that they admit they saved as a result of implementing the nutrient profile. However, ConAgra argues that because it no longer uses the profile, it does not remain valuable. The fact remains that ConAgra used the nutrient profile and saved substantial costs for a period of time, and that is sufficient to support the trial court's finding that the

fourth *Saforo* factor was satisfied as to the value of the secret. Certainly, the trial court's finding was not clearly erroneous.

The trial court next weighs the amount of effort or money expended by the appellee in developing the information to determine if there is a trade secret. With respect to the fifth *Saforo* factor, the testimony is not controverted that Tyson invested much time, money, and effort in developing the confidential nutritional profile. Tyson presents evidence that the effort in developing the nutrient profile involved years of private research by nutritionalists and chemists at Tyson. ConAgra argues that Tyson received this nutrient profile from its acquisition of Holly Farms, and spent no more than a few hours developing the information. Dr. Roy Brister testified that the tests had been under development since 1993. Even if ConAgra is correct in its assertion that the nutrient profile was first developed at Holly Farms, Tyson expended resources acquiring that company and its profile, and that is part of its expenditure in developing the secret formula. Again, I would not characterize the trial court's finding on this *Saforo* factor as being "clearly erroneous."

The sixth element of the *Saforo* test is the ease or difficulty with which the information could properly be acquired or duplicated by others. Tyson argues that though the nutrient levels of a sample of feed could be ascertained from a sample, the samples of feed vary so much that it would be difficult, if not impossible to reverse engineer from a sample, as Dr. Brister testified: "My opinion is absolutely not. I say that for all the reasons we've talked about and because it is based on Tyson data from our thirty-one complexes, years of information . . . Looking at our history, it would take fifteen years or more [for ConAgra to develop the same nutrient profile.]

Furthermore, getting the percentages of supplemental nutrients exactly right is key to saving the money that ConAgra saved. Dr. Brister testified: "A one-hundredth of a percent change in Lysine for Tyson is nearly five-million dollars. Even on these concepts, the last hundredth decimal place can be millions of dollars from Tyson's standpoint."

Dr. Brister put it very succinctly: "Based on the variations I have discussed, it is my opinion that neither ConAgra nor another poultry company could determine Tyson's nutrient profile by reverse engineering. Even if ConAgra or another competitor knew the amino acid levels in all of Tyson's five feeds, they could not recreate the information on this chart." Certainly the trial court was not clearly erroneous in concluding that this sixth *Saforo* factor supported the existence of a trade secret.

Everyone agrees that the nutritional profile was confidential. Whether this confidential information should be treated as a trade secret should be subject to a *Saforo* analysis. The findings by the trial court that each of the *Saforo* factors was satisfied and that the nutrient profile is a trade secret are based upon convincing evidence. The trial court's findings are not clearly erroneous. Thus, the judgement based upon those findings should be affirmed, and the granting of a JNOV on a misinterpretation of law should be reversed.

*Was the trial court clearly erroneous in finding that the nutrient profile formula was misappropriated?*

II.   Misappropriation of a Trade Secret

Where a trade secret is at issue, we must next determine whether ConAgra misappropriated the secret. Misappropriation of a trade secret is defined at Ark. Code Ann. § 4-75-601 as:

> (A) Acquisition of a trade secret of another by a person who knows or who has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure of use of a trade secret of another without express or implied consent by a person who:
>
> (i) used improper means to acquire knowledge of the trade secret; or
>
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
>> (a) derived from or through a person who had utilized improper means to acquire it;

(b) acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limits its use; or

(iii) Before material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.*

ConAgra's actions clearly constitute misappropriation of a trade secret. Purtle knew or had reason to know that giving the confidential nutrient profile to ConAgra constituted a conversion of the trade secret for ConAgra's benefit by improper means. He understood the nutrient profile to be "confidential" and in limited distribution within Tyson, but still gave it to ConAgra nutritionists for use in order to reduce costs. Purtle's misappropriation of the nutrient formula was a breach of his agreement with Tyson to keep that information confidential. His former position at Tyson as the Senior Vice-President of Retail Sales at Tyson gave him access to confidential trade secrets. He handed over those trade secrets to ConAgra immediately after being hired, a blatant misappropriation and abuse of his former position at Tyson.

It seems clear to me that the trial court's findings that the nutrient profile was a trade secret, that the trade secret was misappropriated and delivered to a competitor, and that this misappropriation of a trade secret damaged Tyson in a substantial amount are all supported by the evidence. I cannot find an instance where those findings were "clearly erroneous."

For that reason, I believe we should reverse the trial court on its erroneous interpretation of the principles of law articulated in our decision in *Tyson I,* and reinstate the trial court's findings and the jury verdict. Because the majority concludes otherwise, the majority did not discuss the issue of a possible remittitur, and I will also refrain from addressing that issue.

I respectfully dissent.