IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 23, 2008

**DAVID WAYNE SMART v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-162   J. Randall Wyatt, Jr., Judge**

———————

**No. M2007-00504-CCA-R3-PC - Filed February 4, 2008**

———————

The Petitioner, David Wayne Smart, was convicted in 2001 of first degree premeditated murder and sentenced to life in prison. We affirmed that judgment on direct appeal, and the Tennessee Supreme Court denied permission to appeal. The Petitioner subsequently filed a petition for post-conviction relief alleging he was denied the effective assistance of counsel. The post-conviction court denied the petition after a hearing. Upon a thorough review of the applicable record and law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

David M. Hopkins (on appeal) and Michael Colavecchio (at post-conviction hearing), Nashville, Tennessee, for the Appellant, David Wayne Smart.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Lisa Naylor, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This Court described the facts underlying the Petitioner's conviction for first-degree murder on direct appeal as follows:

*State's Proof*

The State's first witness was Lanell Merchant, who was working as a cashier

at the Phillips 66 store at the time the shooting occurred. She testified the defendant pulled into the gasoline station between 5:15 and 5:30 p.m. on September 27, 2000, to purchase gasoline for his taxicab. As he was paying for his purchase inside the store, the victim entered and the two men made eye contact but did not speak. The victim then walked across the store to the water fountain. Although the defendant continued his transaction at the cash register, he kept looking over at the victim and appeared to be upset, prompting Merchant to ask him what was wrong. She described the scene and the explanation the defendant provided for his behavior:

> When [the victim] was getting a drink of water, [the defendant] seemed a little tense. And I had asked him if he was okay. And he just kept looking. And he said, "That boy robbed me," and I guess I kind of glanced over. And I said, "Just now?" And he said, "No. It was a while back."
>
> . . . .
>
> And I said, "Well, did he go to jail for it?" And he said, "No, but I am." He said, "I'll be right back."

Merchant testified the defendant completed his purchase, exited the store, and drove off in his taxicab. After he left, the victim asked what the defendant had just said to her, and she and the victim engaged in a short conversation until her attention was claimed by other customers. Merchant revealed the substance of that conversation on cross-examination, testifying that she told the victim that the defendant had said something about the victim's having robbed him, to which the victim replied, "[Y]eah, I robbed him, but he robbed me first."

A short while later, Merchant looked up and saw the defendant enter the store again and confront the victim, saying, "Give me all of your money. I want everything on you." Merchant testified the victim responded by walking over to the defendant and saying, "No, you're not getting anything." At that point, the defendant reached into his back pocket. The victim said, "Don't pull that gun out of your pocket," but the defendant pulled out a small silver gun that "looked like a fake gun," pointed it at the victim, and shot him. Merchant was aware of the defendant's having fired a total of four shots at the victim before leaving the store and driving off in his pickup truck, which was parked outside. She said the first shot caused the victim to fall to the floor on the front side of the counter, where the defendant was standing. The victim attempted to escape by first "trying to scoot away from [the defendant]" and then by jumping over the counter to the other side. The defendant continued to shoot at him during this time, firing his second shot as the victim was lying on the floor in front of the counter and his fourth shot after the victim had tumbled to the floor behind the counter. Merchant said she did not see the third shot, but was within three

2

or four feet of the victim when the fourth and final shot was fired. After the defendant left, she locked the door and gathered towels to hold against the victim's wounds, while her coworker and a store customer telephoned for an ambulance and police.

A videotape of the incident, which Merchant identified as having been recorded by the store's surveillance camera, was played at various speeds before the jury and introduced as an exhibit in the case. Merchant agreed the videotape reflected that, contrary to what she had reported in her initial statements to police, only two minutes elapsed from the time the defendant left the store until he returned to shoot the victim, and he did not appear to have changed clothes during the interim. She testified she did not hear the victim threaten the defendant or see the victim with a gun or make any movement as if to reach for a gun.

On cross-examination, Merchant acknowledged she had been so severely traumatized by the incident that she had never returned to work at the store. She conceded she had been mistaken in several of the details she had provided in her initial statement to police and in her testimony at the preliminary hearing, but maintained her memory of what the defendant said to her before leaving the store the first time, as well as the words the defendant and victim exchanged just prior to the shooting, was accurate. She acknowledged the defendant did not have a gun in his hand when he returned to the store to confront the victim, but her testimony at the preliminary hearing had been that, as the defendant was demanding the victim's money, the victim "stepped up to him, as in bowing up, as if he was angry." She explained that by "bowing up" she meant that the victim got close to the defendant. Merchant acknowledged having told the police that the defendant's hand was shaking as he reached for his gun and that he almost dropped the weapon. She testified the defendant was angry and explained that she shook when she was angry, too. However, she conceded she had not said anything about the defendant's having been angry in her statement to the police, and agreed that fear and nervousness could also cause a person to shake. The victim, according to Merchant, was "definitely heavier and stronger" than the defendant.

Richard Taylor testified he had been working at the Phillips 66 store for approximately three months and was on duty inside the store at the time the shooting occurred. He said he was familiar with both the defendant and the victim as regular customers of the store. On the day of the shooting, he saw the defendant arrive in a green, checkered taxicab van. The victim entered the store after the defendant was inside, and the two exchanged a "definite stare for a few moments." Nothing happened at that point, and the defendant left the store.

Taylor testified that when the defendant returned, he first looked in the door of the store "to see if [the victim] was still in there" and then went back to his pickup

3

truck, where he retrieved what Taylor assumed was his gun, before coming back inside the store. Taylor described exactly what he witnessed: "I seen [sic] [the defendant] go to his truck, open the driver's door, pull out something silver, and put it in his back pocket. And at that time, [the victim] said, 'Don't let him bring that gun in the store.'" Taylor said the defendant told the victim after entering the store, "Give me all your money," to which the victim responded, "No. And don't pull that gun out." Next, the defendant "pulled the gun out and shot [the victim]." Taylor testified he heard a total of "[t]hree or four" shots, and corroborated Merchant's testimony that the victim appeared to be trying to escape from the defendant as the successive shots were fired. Taylor said that, in the victim's efforts to get away from the defendant, the victim went first to the corner of the store where the fountain drinks were and then jumped over the back counter, landing approximately six to eight feet from where the first shot had been fired. Taylor did not hear the victim threaten the defendant, did not see him with a gun, and did not see him make any motions as if to reach for a weapon.

Taylor acknowledged on cross-examination that he did not hear Merchant's conversations with the defendant or the victim and that, although he saw the defendant retrieve a silver object from his truck, he did not actually see that it was a gun. He testified the defendant was not holding the gun when he entered the store and did not pull it out until after the victim had already approached and was standing face-to-face with him.

Isabel Davis testified she stopped by the Phillips 66 store at about 5:20 p.m. on September 27, 2000, to make a purchase. She was aware of some sort of commotion between the defendant and the victim but did not pay much attention, believing they were "just kind of joking around or fighting." Davis heard what she thought were gunshots as she was walking out of the store, but immediately "disregarded it, because it was not loud at all." However, when she turned around and saw the defendant run out of the store, she realized the situation was serious and called 9-1-1. She heard a total of four or five gunshots and saw the defendant holding a small, silver revolver, but did not actually see him fire the shots. She did not see or hear the victim threaten the defendant in any way. She thought the victim "seemed more afraid" of the defendant than menacing, based on what she heard him say to the defendant, which was "[s]omething in the nature of don't bring that gun in here, man, don't bring this gun in here."

On cross-examination, Davis acknowledged having told police that the defendant grabbed the victim's shirt while she was in the store. She recalled having heard the defendant and the victim engaging in "street talk" while she was still inside, and said "they somehow rammed each other, or something like that" as she was walking out the door. She could not remember if any profanity was used or what specifically was said, other than the victim's telling the defendant not to bring his gun

4

into the store. She agreed she had described the defendant to police as short and skinny, and that the victim was a larger man.

The autopsy of the victim's body was performed by Dr. Bruce Phillip Levy, the chief medical examiner for Davidson County. Dr. Levy testified he found a total of four gunshot wounds to the victim's body: a fatal gunshot wound to the center of the victim's chest, which struck the heart and right lung and caused him to bleed to death; a nonfatal, "very superficial wound" across the front of his right knee; and two nonfatal gunshot wounds to his left thigh area. He stated that someone with the type of gunshot wound to the heart and lung suffered by the victim would not die immediately and would "be able to remain conscious for a short period of time" before being rendered unconscious by the loss of blood. Dr. Levy testified the toxicology report on the twenty-one-year-old, 185 pound, 5' 9" victim showed the presence of "metabolites of both cocaine and marihuana" in his urine, but no drugs or alcohol in his blood. He explained these findings meant that the victim had used both marijuana and cocaine within a day or two of his death but had not been actively under the influence of the drugs at the time he was killed. Finally, he testified there was no evidence of "close or intermediate range fire," which meant that the gunshots had been fired from a distance of greater than twenty-four inches from the victim's body.

Detective Joe Williams of the Metro Police Department, the lead investigator assigned to the shooting, testified that a total of four shots were fired at the store. Interviews conducted of the witnesses at the scene led to the defendant being developed as a suspect in the shooting. In his attempts to locate the defendant, Detective Williams sent officers to the defendant's residence, approximately a block and a half from the store, and contacted the defendant's employer. Although the defendant was not at home, officers found his tan Ford Ranger pickup truck at his house. The defendant's Checker taxicab van was later found abandoned behind a warehouse approximately three to five miles from the store. Detective Williams testified he spoke with the defendant by telephone at about 1:30 or 2:00 a.m. the next day, the defendant's employer having provided him with the defendant's cell phone number. Subsequently, at about 5:30 a.m., the defendant turned himself in, arriving at the police station with his .25 caliber semi-automatic handgun, which he turned over to police.

Detective Williams testified the store's surveillance tape revealed the following chronology of events: The defendant entered the store at 5:18:46; the victim entered the store at 5:20:52; the defendant exited the store at 5:21:35, pulled back into the station at 5:23:26, opened the door and looked in the store at 5:23:37, came back and entered the store at 5:23:51, confronted the victim at 5:23:54, pulled his gun from his pocket and fired his first shot at 5:23:59, fired his last shot at 5:24:24, and exited the store at 5:24:28. Detective Williams acknowledged on

5

cross-examination that, to his knowledge, the only arrest or conviction the defendant had on his record was for driving on a suspended license in the 1980s.

### *Defense Proof*

The defendant testified he was thirty-four years old, weighed 120 pounds, and, except for driving on a suspended license in the 1980s, had never before been in trouble. He said he was a nonviolent, peaceful man and had not been in a fight since elementary school. After graduating from high school in 1985, he had served in the Navy before attending ITT Technical Institute, from which he had received an associate's degree in Electronic Engineering Technologies. Although he had at first worked in the electronics field, he had become burned out and, about five or six months prior to the September shooting, had begun driving a taxicab to earn his living.

The defendant testified he had moved in either 1992 or 1993 to a house located approximately fifty to seventy-five yards from the Phillips 66 market, where he still lived at the time of the shooting. The victim lived in the same neighborhood and, according to the defendant, was known by everyone as "the terror of the neighborhood." The defendant testified he knew the victim carried a weapon because he had once shown it to him. He also knew of the victim's having committed several violent acts in the past, including threatening the life of an eleven-year-old child as he held his gun to the back of the child's head, threatening the life of the mother of the child, beating up the mother of the child, and robbing, threatening, and breaking into the homes of several men. The defendant testified he himself had had two frightening encounters with the victim in the days leading up to September 27. The first occurred about a month before the shooting when the victim knocked on his door and told him he needed $30 to bail his mother out of jail. The defendant said he initially told the victim he did not have any money, but ultimately gave him the $28 he had in his wallet because the victim "had started to act like he was going to force his way in," telling the defendant to give him whatever money he had.

The defendant testified his second frightening experience occurred about a week before the shooting. According to his account, he was home alone expecting a friend to arrive momentarily when he heard a knock at his door. Thinking it was his friend, he called out "come in" and the victim walked into his living room with a "Game Boy," which he tried to persuade the defendant to buy. The defendant said he told the victim he did not want the game, but the victim became increasingly more persistent that he buy it, which made the defendant "nervous." He testified he did not want a confrontation with the victim and implied he was afraid to ask him to leave his home. Therefore, he called his friend to ask how soon he could arrive, hoping that once he did so, the victim would leave. However, as he hung up the telephone, the victim stood up in front of him, grabbed his arm, knocked him down, grabbed

6

approximately $200 that the defendant had in an ashtray, and ran out the door.

The defendant testified that the first time he saw the victim after the robbery was on the afternoon of September 27, when the victim walked past him in the Phillips 66 store as he was paying for his gas and then turned around and gave him "a real mean look," which he interpreted to mean that the victim was going to "get" him. The victim did not, however, say anything to him at that time. The defendant testified he kept looking over at the victim to make sure he was not about to come after him and, at the same time, tried to "hurry up and get out" of the store, with his "number one goal" being "to run, to flee." He remembered telling the cashier that the victim had robbed him, but had no memory of the other conversation the cashier reported, that is, that he had responded to her question of whether the victim had gone to jail for the robbery with the words, "No, but I am." The defendant stated he had no intention of returning to the store when he left after paying for his purchase and that the exchange the cashier reported was not the kind of statement he would ordinarily make.

The defendant testified he did not feel safe when he reached home, however. He "just . . . knew" that the victim, realizing he had just gotten off work and had money, would follow him to his house to "either rob . . . or hurt" him. He therefore decided to return to the store to confront the victim in public, where he felt safer. The defendant explained:

> I felt like that my choices were limited. I couldn't – I couldn't stay there and wait for him to come back, because that would definitely be a violent situation. So I thought that if I confronted him in public, if I could catch him while he was still up there, in public, that I could keep him from coming to my house again and that he wouldn't rob me.

The defendant insisted his intention in returning to the store was simply to get back the money the victim had stolen from him. However, because he knew the victim's reputation for violence and his propensity for carrying a weapon, he decided to take a gun with him for protection when he confronted the victim. The defendant testified he owned both a .25 caliber gun and a larger, more powerful "Tech Nine," and that he chose to take the smaller gun because he did not plan on using his weapon. He said he placed the gun in his left rear pocket, although he was right-handed, because his wallet was in his right rear pocket. He then got into his truck and drove back to the store.

The defendant testified he got out of his truck when he arrived at the store, walked to the door, and peeked inside to see if the victim was still there. Although the videotape shows he looked in the direction of the victim, the defendant claimed

he did not see him and therefore went back outside and walked to the end of the building to see if the victim was already headed to his house. He denied he went to his truck to get his gun, testifying that it was already in his back pocket. He stated that when he did not see the victim outside, he returned to the store to ask the cashier if she knew where the victim had gone. Inside the store, however, he immediately saw the victim and, with his gun still in his back pocket, walked toward the victim and asked for the return of his money.

According to the defendant, the victim responded by becoming very angry and "coming at [him] like a charging . . . bull," yelling, "[M]other fucker, you going to come in here and start talking shit? Who do you think you are, mother fucker?" The defendant testified he was "shocked" and ceased walking toward the victim, stopping "[p]robably eight to ten feet" from him. He said that the victim kept coming at him, however, and, when he was "right up in [his] face," said, "I suggest you pull that gun out of your pocket." The defendant said that the manner in which the victim spoke indicated to him that the victim was letting him know he knew the defendant had a gun, and that he was either going to pull his own gun or try to take the defendant's. He testified that he was "scared to death" because he believed in that instant that the victim was going to kill him. Therefore, he reached into his back pocket with his left hand, pulled his own gun out, switched the weapon to his right hand, took a step back, and fired at the victim. The defendant said he was shaking so badly with fear that he almost dropped the weapon as he switched it from his left to his right hand. He testified that the victim backed up after he fired the first shot, and he then fired a "couple of more shots at his legs, just to keep him back so [he] could get out the door." The defendant acknowledged he went toward the victim as he fired these latter shots, but explained it was because he still believed the victim had a gun and feared he would pull it out and shoot him. He said he turned around and fired his last shot as he was going out the door because he thought the noise the victim made as he was jumping over the counter was the sound of the victim coming after him.

The defendant adamantly denied he ever had the intent to kill the victim. He said he fired the first shot because he was afraid for his life and was trying to keep the victim from getting his gun, and testified that "[o]nce the first shot went off, it was over – emotions overwhelmed me. It was like something that he had made me do." The defendant went on to testify, however, that he fired the successive shots "[j]ust so [he] could get out" of the store. He said he deliberately fired shots two, three and four at the victim's legs, and that he did not know the victim was dead when he left the store.

At defense counsel's request, the defendant reviewed and narrated copies of the surveillance videotape, subsequently admitted as exhibits, which showed the action both in "real-time," as opposed to the fast-motion recorded by the store's

8

surveillance tape, and in slow motion.  He described the pertinent scene as follows:

A: When I come back in, I ask him for my money, right there.

Q: That's what that movement is with your right hand, I want my money back?

A: Right. And then I take three steps and I stop.  He comes at me. And as he's coming at me, he's cussing me.  He says, I suggest you take that gun out of your pocket.  And I reach back with my left hand and swap it over to my right.  As I swap it over, I almost dropped it. And then I fired.

The defendant also identified a series of still photographs made from one of the videotapes, subsequently admitted as a collective exhibit in the case, which show that a six-second interval elapsed during which he stood still as the victim approached him in the store.  He said he was not angry when he shot the victim, was not intending to get revenge for his earlier robbery, and did not intend to kill the victim.

The defendant testified on cross-examination that he characterized the victim's walking toward him as "coming at [him]" because the victim had a "bad attitude, an attitude like he's getting ready to fight."  He admitted, however, that the victim did not threaten to kill or hit him, did not have a gun, never touched him, never raised his hands toward him or made any motions to reach for a gun, and had his hands down at his side when the defendant shot him.  He denied that the victim fell to the floor after the first shot and maintained that he had deliberately aimed his successive shots at the victim's legs, despite the videotape showing that his last shot appeared to have been somewhat randomly and carelessly fired in the direction of the victim when he turned around before going out the door.  He also insisted that the victim was still coming toward him at the time he fired his first shot, in spite of the videotape which shows that the victim had stopped.  The defendant acknowledged his nine-millimeter "Tech Nine" would not have fit into his back pocket, but insisted that fact played no part in his decision to take his smaller caliber weapon with him to the store.  He explained he had not called the police to report the victim's robbery at his home because he feared the victim's reaction.  He said he went home after the shooting and then drove his taxicab to the workplace of a friend, who in turn drove him to the home of his brother, Donnie Smart, in Murfreesboro.  He testified he was emotionally distraught after the shooting and denied he had been attempting to hide from the police.

Donnie Brooks testified he had been friends with the defendant for six or seven years and knew him to be a very peaceful, nonviolent man.  According to his

9

testimony, the defendant showed up in his taxicab at his workplace shortly after the incident, wanting Brooks to take him to turn himself in. Brooks said the defendant appeared to be in a state of shock, had difficulty talking, and was unable to clearly tell his story in a telephone call he made to his brother in Brooks's presence, handing the telephone to Brooks to complete the call. After telling the defendant's brother that he would bring the defendant to him, Brooks drove the defendant to Murfreesboro in his vehicle, leaving the taxicab at Brooks's workplace.

The defendant's brother, Donnie Smart, also described the defendant as peaceful and nonviolent and testified that he knew the defendant was scared and intimidated by the victim in the week preceding the shooting. He corroborated Brooks's testimony that the defendant had been so emotionally distraught when he telephoned him at about 6:00 the evening of the shooting that he was unable to complete his conversation and had to turn the telephone over to Brooks. He testified that at approximately 6:30 p.m., the defendant and Brooks arrived at his Murfreesboro home, where they discussed what had occurred. He said the defendant "was destroyed," crying and saying he was sorry, when he learned from the 9:00 p.m. news that the victim had died. At 4:00 the next morning, he went with the defendant to the police station to turn himself in.

Checker Cab Company owner Larry Tidwell testified the defendant had worked as a cabdriver for his company for approximately five or six months at the time of the shooting. He said the defendant told him he was afraid to work at night and, as a consequence, worked daytime hours, primarily running airport trips, which, according to Tidwell, is the safest duty a cabdriver can have. Tidwell said that, before this incident occurred, he had never known the defendant to be violent. On cross-examination, he testified he spoke with the defendant by cell phone on the night of the shooting, and confirmed having told police that the defendant told him in that conversation that he had shot the victim twice, in the stomach and leg, and had shot at him again after he fell to the ground and "balled up," but did not know if he had hit him with those shots.

Antonio Caruthers, the defendant's next-door neighbor, testified he had known the defendant for a number of years and believed him to be a peaceful, nonviolent man. He said that about a week before the shooting, he was in his driveway when he saw a man he did not recognize run out of the defendant's house and down the road. A few seconds later, the defendant ran out of his house, yelling something to the effect, "[S]top him, he just robbed me." Caruthers testified he did not know the victim.

The defendant's final four witnesses, John Turnbo, Jane Spear, Teresa Davis, and Tim Wilson, all testified to the victim's reputation in the community for violence. Turnbo testified the victim was "very violent." He said on July 9, 1997, the

10

victim jumped the fence at his house, vandalized his truck, threatened his life, and assaulted his then girlfriend. He acknowledged he did not see the assault, but said the victim and his girlfriend were the only ones outside the house at the time, that he heard the victim from his position inside the house, and that he saw bruises on his girlfriend's face after the victim left, which had not been there before he arrived. Spear testified she had known the victim for a number of years and had heard that he was "a very violent young man." Davis testified the victim's reputation in the community was that he "could be violent on occasion." She said when the victim was about fourteen, he put a gun to the head of her then eleven-year-old son, but she did not witness the incident. Finally, Wilson testified that the victim was known in the community as a violent person and that he knew of the victim's having beaten up two neighborhood children. In his opinion, the victim "kind of terrorized the neighborhood," but he had never heard anything bad about the defendant.

*State v. David Wayne Smart*, No. M2001-02881-CCA-R3-CD, 2003 WL 21077997, at \*2-9 (Tenn. Crim. App., at Nashville, May 12, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003).

At the post-conviction hearing where the Petitioner alleged he failed to receive the effective assistance of counsel, the following evidence was presented: the Petitioner's trial counsel ("Counsel") testified that, at the time of the Petitioner's case, he was handling a number of other serious cases. However, he was able to meet with the Petitioner "a bunch of times." Counsel stated that he viewed the videotape of the incident at the "fast" speed, and he was also able to slow down the tape to close to normal speed; Counsel introduced the videotape at trial. With respect to Merchant's testimony, Counsel stated that he could think of no way to prevent Merchant from testifying to what she saw.

Counsel stated that he prepared the Petitioner by working through the direct examination, and he explained how the cross-examination might unfold. They were prevented from putting on extensive proof concerning the victim's previous record of violence, but the Petitioner was able to explain how the victim robbed him a few days prior to the shooting. Counsel stated he did everything he could in attempting to present the victim's "thirty-something arrests over . . . more than one county." The Petitioner's only defense was one of self-defense, which the jury did not accept. Counsel saw no reason to challenge the grand jury's indictment of first degree murder. Counsel requested a jury instruction on aggravated assault, but the trial court denied that request.

On cross-examination, Counsel agreed that he did not highlight the fact that the Petitioner knew where the victim lived. Counsel clarified that he did not ask for the aggravated assault charge until after the jury instructions had been read. However, the trial court denied the request, and this Court affirmed that decision on appeal. Other than the aggravated assault instruction, Counsel felt nothing was incorrect or incomplete about the instructions. Counsel further stated that he felt there were no grounds upon which to challenge Merchant's testimony and specifically her recitation of what the Petitioner told her prior to the shooting. Counsel stated that he made no attempt to have the indictment changed to reflect that first degree murder required the Petitioner to be "free from

11

passion and excitement," as he felt that was not necessary.

The Petitioner did not testify at the post-conviction hearing, and the court denied relief by written order thereafter. Subsequent to the hearing and order denying relief, post-conviction counsel moved to withdraw, and his motion was granted. The Petitioner then filed a pro se petition to amend findings or make additional findings. That request was also denied. The Petitioner was appointed counsel and appealed.

## II. Analysis

On appeal, the Petitioner alleges he did not receive the effective assistance of counsel at trial. Specifically, he alleges Counsel failed in the following respects: (1) by not requesting an aggravated assault jury instruction; (2) by not requesting Merchant's testimony be suppressed; (3) by not objecting to the State's impeachment of him with the crime for which he was on trial; and (4) by not objecting to an allegedly faulty indictment. Additionally, the Petitioner argues the post-conviction court erred in denying the petition to make additional findings.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes

12

both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We will address each allegation of ineffectiveness in turn.

13

### 1. Failure to Request Jury Instruction

First, the Petitioner alleges Counsel was ineffective in failing to request aggravated assault jury instructions. Specifically, he argues that, had Counsel properly argued to the jury that the first of the four shots was in self-defense, the last three shots were aggravated assaults, and if the jury was instructed on aggravated assault, the outcome of his trial would have been different.

When the Petitioner was convicted in 2001, the trial court was required to "instruct the jury on all lesser offenses if the evidence introduced at trial [was] legally sufficient to support a conviction for the lesser offense." *State v. Bolden*, 979 S.W.2d 587, 593 (Tenn. 1998); *see* T.C.A. § 40-18-110 (1997). The Tennessee Supreme Court noted that "the trial court's obligation under this statute is mandatory, provided there is sufficient evidence for a rational trier of fact to find a defendant guilty of a lesser offense." *Bolden*, 979 S.W.2d at 593. Under this earlier version of Tennessee Code Annotated section 40-18-110, as compared to the current version which took effect in 2002, a defendant was not required to request a lesser-included instruction to raise the trial court's failure to give such an instruction as an error on appeal. *See State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006).

Because the trial court had a mandatory duty to instruct the jury on lesser-included offenses regardless of a request to do so from the defendant, this court has previously concluded that defense counsel was not ineffective for failing to request an instruction on a particular lesser-included offense. *Jerome Sawyer v. State*, No. 2005-01813-CCA-R3-PC, 2007 WL 778828, at *20 (Tenn. Crim. App., at Jackson, Mar. 15, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007); *Chivous Robinson v. State*, No. E2005-01036-CCA-R3-PC, 2006 WL 1381511, at *6 (Tenn. Crim. App., at Knoxville, May 19, 2006), *perm. app. denied* (Tenn. Oct. 2, 2006); *Jeffery Lee Miller v. State*, No. M2003-02841-CCA-R3-PC, 2005 WL 901130, at *5 (Tenn. Crim. App., at Nashville, Apr. 19, 2005), *perm. app. denied* (Tenn. Oct. 17, 2005); *see also Larry Johnson v. State*, W2006-00345-CCA-R3-PC, 2007 WL 2120184, at *10 (Tenn. Crim. App., at Jackson, July 24, 2007), *perm. app. denied* (Tenn. Dec. 26, 2007). Thus, the Petitioner is not entitled to relief on this issue.

### 2. Failing to Object to Merchant's Testimony

Next, the Petitioner argues that Counsel failed to prevent Merchant, the eyewitness store clerk, from testifying about the conversation she had with the Petitioner just prior to the shooting. The post-conviction court found that Counsel had no reason to object to Merchant's testimony, and he was under no obligation to file meritless claims. Thus, the post-conviction court found Counsel was not deficient.

On appeal, the Petitioner argues Counsel should have objected to the testimony under Tennessee Rule of Evidence 403. That rule states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Petitioner states in his brief that "[t]he statement . . . was

unfairly prejudicial due to the inference of premeditation th[at] could be drawn from it."

Merchant testified the Petitioner told her that the victim robbed him and that he, the Petitioner, would be going to jail instead of the victim. The statement is clearly prejudicial to the Petitioner because it provides support for the State's theory that the murder was premeditated. It is in no way, however, *unfairly* prejudicial. The Petitioner's own statement might, in fact, be considered the most fair piece of evidence on the issue of premeditation. We see no reason for a trial court to prohibit Merchant's testimony under Rule 403. Thus, the Petitioner has not proven counsel was deficient in failing to object to this evidence. He is not entitled to relief on this issue.

### 3. Failing to Object to State's Impeachment of Petitioner

Third, the Petitioner complains that Counsel failed to object when the State cross-examined him. Specifically, the Petitioner put on evidence of his own good character and was questioned by the State about what effect the shooting at issue would have on his general reputation for peacefulness. This would thereby negate the Petitioner's claim that he was not the first aggressor. Counsel did not object to the State's questioning, and at the post-conviction hearing he stated that he felt it had little or no effect on the outcome of the case as the Petitioner's primary defense was self-defense.

The Petitioner cites to *Powers v. State* as follows:

The reputation which a defendant has made upon the subject of quietness and good citizenship available for or against him in a criminal cause when he puts his character in issue is that which he bore at and before the taking place of the act for which he is upon trial, not a reputation subsequently acquired or created for or against him. A different view would put a premium on the manufacturing of evidence.

97 S.W. 815, 817 (Tenn. 1906). The trial court noted that the *Powers* case was decided prior to the adoption of the rules of evidence, but it is nevertheless logical and consistent with the rules. We agree and note that *Powers* does not preclude the questioning of a defendant in a situation such as the Petitioner's. That case allows cross-examination on character "which he bore at and before the taking place of the act for which he is upon trial . . . ." *Id*. This would seem to include questioning about whether the crime in issue would have any effect on a reputation for peacefulness.

The Petitioner additionally argues Counsel was also deficient in that Rule 405 prohibited the State's questioning about specific instances of conduct prior to a hearing outside the presence of the jury. Tenn. R. Evid. 405(a)(1). A Rule 405(a)(1) hearing will allow the court to determine if there is a reasonable factual basis for the inquiry and, if so, that the probative value outweighs the prejudicial effect on the substantive issues. Tenn. R. Evid. 405(a)(2)-(3). While it appears that Counsel may have been successful in preventing the testimony until after a hearing on the issue, we, like the trial court, can find no prejudice. We see no reason to doubt the factual basis for the claim – the shooting was caught on camera – and no reason to conclude there is any real prejudicial effect

15

on the Petitioner. The question served to highlight the fact that the shooting was completely at odds with the Petitioner's prior conduct. Thus, a hearing would have similarly resulted in the question being allowed. The Petitioner has not proven that he was prejudiced, and, therefore, he is not entitled to relief on this issue.

### 4. Failing to Object to Allegedly Faulty Indictment

Next, the Petitioner alleges that Counsel failed to object to, what is in his view, is a faulty indictment. The indictment reads as follows:

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that: DAVID WAYNE SMART on the 27th day of September, 2000, in Davidson County, Tennessee and before the finding of this indictment unlawfully, intentionally, and with premeditation did kill Gabriel Jeans, in violation of Tennessee Code Annotated § 39-13-202, and against the peace and dignity of the State of Tennessee.

The trial court found that the allegation of a defective indictment was baseless, and Counsel was under no obligation to file a meritless objection.

The Tennessee Supreme Court has stated that a constitutionally sufficient indictment requires the following things: "notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). Tennessee Code Annotated section 40-13-202 states:

The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force and arms" or "contrary to the form of the statute" necessary.

*State v. Hammonds* stated that "*Hill* and its progeny leave little doubt that indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." 30 S.W.3d 725, 727 (Tenn. 2000).

The Petitioner's indictment gave proper notice to the Petitioner so as to satisfy constitutional and statutory requirements. We reject the Petitioner's argument that the indictment needed to specifically state that he acted free from passion and excitement. Counsel was not deficient; the Petitioner is not entitled to relief on this issue.

## 5. Additional Findings

Finally, the Petitioner argues the post-conviction court erred in refusing to make additional findings on issues not raised by post-conviction counsel at the post-conviction hearing. After the post-conviction hearing on August 10, 2006, the Petitioner filed a pro se petition to amend findings or make additional findings on February 14, 2007. The post-conviction court denied the petition in a written order on February 16, 2007. In the petition to make additional findings, the Petitioner alleged that his post-conviction counsel failed to properly present all of his claims and prevented him from being fully heard. The post-conviction court found that the Petitioner was afforded a full evidentiary hearing and that he does not have the right to the effective assistance of counsel at the post-conviction stage.

Under *Stokes v. State*, "because there is no constitutional right to counsel in post-conviction proceedings, . . . 'there is no constitutional right to effective assistance of counsel in post-conviction proceedings.'" 146 S.W.3d 56, 60 (Tenn. 2004) (quoting *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995)). The Tennessee Supreme Court specifically held that "a claim of ineffective assistance of post-conviction counsel could 'not establish a legal excuse for failure to raise issues in the initial proceeding.'" *Id*. "All that due process requires in the post-conviction setting is that the defendant have 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id*. at 61 (quoting *House*, 911 S.W.2d at 711 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976))). We agree with the trial court that the Petitioner was "heard at a meaningful time and in a meaningful manner." Additionally, because the Petitioner is not entitled to the effective assistance of counsel at the post-conviction stage, he cannot thereafter complain that post-conviction counsel did not properly present his claims. The Petitioner is not entitled to relief on this issue.

## III. Conclusion

We conclude that the Petitioner was not denied the effective assistance of counsel at trial. Additionally, the post-conviction court did not err in denying the Petitioner's petition to make additional findings. As such, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE